**Arnon MOZES, In re the Application of, Petitioner–Appellant,**

v.

**Michal MOZES, Respondent–Appellee.**

**No. 98–56505.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1999.

Filed Jan. 9, 2001.

Adair Dyer, Austin, TX, William M. Hilton, Santa Clara, California, for petitioner-appellant.

Ira H. Lurvey, Judith Salkow Shapiro, Lurvey & Shapiro, Los Angeles, California, for the respondent-appellee.

Before: KOZINSKI and THOMAS, Circuit Judges, and ILLSTON, District Judge.*

KOZINSKI, Circuit Judge.

In a case of first impression in our court, we interpret the term "habitual residence" in the Hague Convention on the Civil Aspects of International Child Abduction.

## I

Arnon and Michal Mozes are Israeli citizens. Married in 1982, they have four children, ranging in age from seven to sixteen years. Until 1997, parents and children lived in Israel, as they had their entire lives. In April 1997, with Arnon's consent, Michal and the children came to Los Angeles. Michal had long wanted to live in the United States, and both parents agreed that the children would profit from a chance to attend school here, learn English and partake of American culture. Accordingly, Michal moved with the children to Beverly Hills, where she leased a home, purchased automobiles and enrolled the children in school. Arnon remained in Israel, but he paid for both the house and the automobiles used by his family, and stayed with them at the house during his visits to Los Angeles. The parties agree that Arnon consented to have Michal and the children remain in the United States for fifteen months, though they disagree as to what understanding existed beyond that. What we know for certain is that on April 17, 1998, a year after they arrived in the United States, Michal filed an action in the Los Angeles County Superior Court seeking dissolution of the marriage and custody of the children. The court granted temporary custody to Michal, and entered a temporary restraining order enjoining Arnon from removing the children from southern California. Less than a month later, Arnon filed a petition in federal district court, seeking to have the children returned to Israel under the Hague Convention. The oldest child elected to return to Israel, and did so by mutual agreement of the parents. Arnon now appeals the district court's denial of his petition with regard to the three younger children.[1]

## II

Adopted in 1980, the Hague Convention on the Civil Aspects of International Child Abduction ["Convention"][2] is intended to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Perez–Vera, Explanatory Report ¶ 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) ["Perez–Vera Report"].[3] Despite the image conjured by words like "abduction" and "force," the Convention was not drafted in response to any concern about violent kidnappings by strangers. It was aimed, rather, at the

---

* The Honorable Susan Y. Illston, United States District Judge for the Northern District of California, sitting by designation.

1. One was aged nine years, and the other two five years, at the time of the district court's decision.

2. 19 I.L.M. 1501 (entered into force October 25, 1980), also available at <http://www.hcch.net/e/conventions/text28e.html>.

3. Elisa Perez–Vera was the official Hague Conference reporter, and her explanatory report is " 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.' " Shalit v. Coppe, 182 F.3d 1124, 1127–28 (9th Cir.1999) (quoting Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed.Reg.

"unilateral removal or retention of children by parents, guardians or close family members." Beaumont & McEleavy, The Hague Convention on International Child Abduction 1 (1999). Such an abductor. "rarely seeks material gain; rather, he or she will aspire to the exercise of sole care and control over a son or daughter in a new jurisdiction." *Id.* The preamble to the Convention describes the signatory states as "[d]esiring to protect children internationally from the harmful effects of their wrongful removal or retention," effects which are thought to follow when a child "is taken out of the family and social environment in which its life has developed." Perez–Vera Report at ¶ 11. This may occur either through the "removal [of a child] from its habitual environment," or by "a refusal to restore a child to its own environment after a stay abroad." *Id.* at ¶ 12.

The Convention seeks to deter those who would undertake such abductions by eliminating their primary motivation for doing so. Since the goal of the abductor generally is "to obtain a right of custody from the authorities of the country to which the child has been taken," *Id.* at ¶ 13, the signatories to the Convention have agreed to "deprive his actions of any practical or juridical consequences." *Id.* at ¶ 16. To this end, when a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 provides that the latter state "shall order the return of the child forthwith." *Id.,* art. 12, 19 I.L.M. at 1502. Further, Article 16 provides that "until it has been determined that the child is not to be returned under this Convention," the judicial or administrative authorities of a signatory state "shall not decide on the merits of rights of custody." Convention,

art. 16, 19 I.L.M. at 1503. The United States and Israel are both signatories to the Convention.[4]

■ The key operative concept of the Convention is that of "wrongful" removal or retention. In order for a removal or retention to trigger a state's obligations under the Convention, it must satisfy the requirements of Article 3:

> The removal or the retention of a child is to be considered wrongful where—
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3, 19 I.L.M. at 1501. A court applying this provision must therefore answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

In this case, the answer to the first question is clear. Arnon claims that Michal wrongfully retained the children from the moment on April 17, 1998, when she asked the Los Angeles County Superior Court to grant her custody of them.[5] The district court denied Arnon's petition based on its answer to the second question: It found that as of that date, the

10503 (1986)). The full text of the Perez–Vera Report is available online at <http://www.hcch.net/e/conventions/exp128e.html>.

**4.** *See* Hague Conference of Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M.

225, 225 (1994). The Convention has been implemented by Congress in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et. seq.*

**5.** *See Re S and another (minors) (abduction: wrongful detention),* [1994] 1 All E.R. 237, 248 (Eng.Fam.Div.) (mother wrongfully retained children by announcing her intent not to re-

children's "habitual residence" was in the United States, not Israel. *See Mozes v. Mozes,* 19 F.Supp.2d 1108, 1116 (C.D.Cal. 1998). Our central task is to review this finding, which we do immediately below. In the interest of judicial economy, and in keeping with the policy of expediting Hague Convention cases, we also address the third and fourth questions below. *See* Part VI *infra.*

## III

We begin by identifying the role of an appellate court in reviewing a determination of habitual residence under the Hague Convention. In doing so, we are mindful that Congress has emphasized "the need for uniform international interpretation of the Convention." 42 U.S.C. § 11601(b)(3)(B). The Perez–Vera Report describes "habitual residence" as "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile." Perez–Vera Report at § 66. In seeking to understand this "well-established concept," *id.,* we discover that although the term "habitual residence" appears throughout the various Hague Conventions,[6] none of them defines it. As one commentary explains, "this has

been a matter of deliberate policy, the aim being to leave the notion free from technical rules which can produce rigidity and inconsistencies as between different legal systems." J.H.C. Morris, Dicey and Morris on the Conflict of Laws 144 (10th ed. 1980) ["Dicey & Morris"].

Clearly, the Hague Conference wished to avoid linking the determination of which country should exercise jurisdiction over a custody dispute to the idiosyncratic legal definitions of domicile and nationality of the forum where the child happens to have been removed. This would obviously undermine uniform application of the Convention and encourage forum-shopping by would-be abductors. To avoid this, courts have been instructed to interpret the expression "habitual residence" according to "the ordinary and natural meaning of the two words it contains[, as] a question of fact to be decided by reference to all the circumstances of any particular case." *C v S (minor: abduction: illegitimate child),* [1990] 2 All E.R. 961, 965 (Eng.H.L.).

Certain commentators, however, have gone considerably farther than this, decrying as an unwelcome technical rule any attempt to develop guiding principles for courts to consult when making findings of "habitual residence."[7] This has not, of

---

turn them to Israel, and asserting that she and they had acquired habitual residence in England, even though this occurred before the agreed-upon period of their stay abroad had ended).

6. *See generally* Hague Conventions on Private International Law, at <http://www.hcch.net/e/conventions/index.html>. The term "habitual residence" first appears in the Convention Relating to Civil Procedure, March 1, 1954, Articles 21, 32.

7. *See, e.g.,* Dicey & Morris, page 1071 *supra* at 144–45:

> [T]he aim being to leave the notion free from technical rules which can produce rigidity.... It is greatly to be hoped that the courts will resist the temptation to develop restrictive rules as to habitual residence, so that the facts and circumstances of each case can be assessed free of presuppositions and presumptions.

*See also* E.M. Clive, *The Concept of Habitual Residence,* 1997 Jurid.Rev. 137, 147:

> [H]abitual residence is a simple concept which should be applied by concentrating on the ordinary and natural meaning of the two words which it contains and on the facts of the particular case. It should not be embellished by technical rules.... The two words "habitual" and "residence" are quite capable of doing all the work which is required of them without the addition of spurious legal propositions.

Dr. Clive surely overstated his point. We have yet to see a court succeed in applying the words "habitual" and "residence" without the aid of other words to explain *why* they do or do not apply to the "facts of the particular case." Whether the other words amount to "spurious legal propositions" depends on whether they help or hinder courts in taking into account, and making sense of, all the circumstances of the cases before them.

course, prevented courts faced with disputes under the Convention from articulating what they understand the "ordinary and natural meaning" of the two words to be, or from looking to cases decided by other courts for help in refining and applying that meaning. Nor should it. Facts, after all, do not come with labels attached, and the family situations of petitioners under the Convention are likely to be quite different from what most people consider "ordinary." In order for decisions under the Convention to be intelligible, courts must be able to explain these conclusions and the reasoning used to reach them. To achieve the uniformity of application across countries, upon which depends the realization of the Convention's goals, courts must be able to reconcile their decisions with those reached by other courts in similar situations. As the leading treatise on the Convention has observed, "[o]nly in exchanging and considering other views will a sophisticated and uniform interpretation evolve." Beaumont & McEleavy,

page 1070 *supra*, at 238. Cutting fact-finding tribunals adrift with only the Bellman's map to guide them does not lead to consistency; it leads only to the absence of any common standard by which inconsistency can be identified.[8]

The Convention seeks to protect children by creating a system of rules that will inform certain decisions made by their parents. "Habitual residence" is the central—often outcome-determinative—concept on which the entire system is founded.[9] Without intelligibility and consistency in its application, parents are deprived of crucial information they need to make decisions, and children are more likely to suffer the harms the Convention seeks to prevent.[10] Imagine, for example, a parent trying to decide whether to travel with a child to attempt reconciliation with an estranged spouse in another country,[11] or whether to consent to a child's trip abroad to stay with in-laws.[12] Such parents would be vitally interested in knowing under what circumstances a child's habitual resi-

8. *See* Lewis Carroll, The Hunting of the Snark, Fit the Second (1872):
>He had bought a large map representing the sea,
>Without the least vestige of land:
>And the crew were much pleased when they found it to be
>A map they could all understand.
>"What's the good of Mercator's North Poles and Equators,
>Tropics, Zones, and Meridian Lines?"
>So the Bellman would cry: and the crew would reply
>"They are merely conventional signs!
>"Other maps are such shapes, with their islands and capes!
>But we've got our brave Captain to thank"
>(So the crew would protest) "that he's bought us the best—
>A perfect and absolute blank!"

*See also* Carol S. Bruch, Temporary or Contingent Changes in Location Under the Hague Child Abduction Convention, Gedächtnisschrift Alexander Lüderitz 43, 45 (H.Schack, ed. 2000) ("This deliberate ambiguity gives courts flexibility in applying the Convention to varying situations. As might be expected, however, it also permits inconsistent and poorly reasoned decisions.") (footnote omitted).

9. *See* Linda Silberman, Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis, 28 Fam.L.Q. 9, 20 (1994) ("The Convention does not provide a definition of habitual residence, but identifying the State of habitual residence is critical.").

10. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993):

>It is important to understand that "wrongful removal" is a legal term strictly defined in the Convention. It does not require an ad hoc determination or a balancing of the equities. Such action by a court would be contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.

Since the strict definition of "wrongful removal" is based on the concept of "habitual residence," an ad hoc determination of the latter amounts to an ad hoc determination of the former.

11. A dilemma discussed in Bruch, note 8 *supra*, at 58–60. *See also* Beaumont & McEleavy, page 1070 *supra*, at 105.

12. *See Re A (Wardship: Jurisdiction)*, [1995] 1 F.L.R. 767, 769 (Eng.Fam.Div.).

dence is likely to be altered, and it is cold comfort to be told only that this is "a question of fact to be decided by reference to all the circumstances of any particular case." *C v. S,* [1990] 2 All E.R. at 965. Parents faced with this response would likely regard the introduction of a few judicial "presuppositions and presumptions," Dicey & Morris, page 1071 *supra* at 145, with more relief than alarm.

This explains why, while a determination of "habitual residence" under the Convention is primarily factual, this has not been understood to mean that it is left entirely within the unreviewed discretion of the trial court. Rather, reviewing courts have taken the approach articulated by Lord Scarman:

> Though the meaning of ordinary words is ... a question of fact, the meaning to be attributed to enacted words is a question of law, being a matter of statutory interpretation. So ... a question of law arises as to the meaning of [habitual residence], even though it arises only at a preliminary stage in the process of determining a question of fact.... It is with this preliminary stage that the [reviewing] courts are concerned.

*Shah v. Barnet London Borough Council and other appeals,* [1983] 1 All E.R. 226, 233 (Eng.H.L.).[13] This is what we refer to in American legal parlance as a mixed question of law and fact, leading the Third Circuit to conclude that findings of habitual residence call for a standard of review where we "accept[ ] the district court's historical or narrative facts unless they are clearly erroneous, but exercis[e] plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Feder*

*v. Evans–Feder,* 63 F.3d 217, 222 n. 9 (3d Cir.1995).[14] Our own precedent puts it somewhat differently: To the extent that the question is essentially factual, one "founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,'" we review the district court's determination only for clear error. *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984) (en banc) (quoting *Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)), *abrogated on other grounds, Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). Where, however,

> the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

*Id.*

## IV

### A: The Relevance of Intent

Perhaps the most straightforward way to determine someone's habitual residence would be to observe his behavior. As Lord Scarman put it, "in their natural and ordinary meaning the words mean that the person must be habitually and normally resident here, apart from temporary or occasional absences of long or short duration." *Shah,* [1983] 1 All E.R. at 234 (internal quotation marks omitted). Under this approach, we might say that if we observe someone centering his life around a particular location during a given period,

---

**13.** Lord Scarman was reviewing a local education authority's application of the term "ordinary residence" in a domestic British statute. In what has become a leading case on "habitual residence" under the Convention, Justice Waite adopted Lord Scarman's discussion, holding that "there is no real distinction between ordinary residence [under British law] and habitual residence [under the Convention]." *Re Bates,* No. CA 122/89, High

Court of Justice, Fam. Div'l Ct. Royal Courts of Justice, United Kingdom, ¶ 33 (1989).

**14.** *See also Friedrich,* 983 F.2d at 1398 (reversing district court's finding of habitual residence as an erroneous application of the concept); *Flores v. Contreras,* 981 S.W.2d 246, 249 (Tex.App.1998) ("We believe this presents a classic mixed question of law and fact.").

so that every time he goes away from it he also comes back, we will call this his habitual residence.

This approach, while intuitively appealing, suffers from a fatal flaw: It may yield strikingly different results depending on the observer's time frame. A child who spends two months at Camp Chippewah, if observed only during that period, would appear to be habitually resident there. On the other hand, if we follow the same child through to adulthood, we might label a couple of years spent studying abroad a mere "temporary absence of long duration." This indeterminacy is unavoidable, as it is "not desirable, indeed it is not possible, to enter into any game of numbers on the duration required." *Adderson v. Adderson,* 51 Alta.L.R. (2d) 193, 198 (Alberta C.A.1987). The absence of an objective temporal baseline however, requires that we pay close attention to subjective intent when evaluating someone's habitual residence.[15] Elaborating on the subjective element of the inquiry, Lord Scarman reasoned that for habitual residence to accrue, there must be a "settled purpose":

> The purpose may be one or there may be several. It may be specific or general. All the law requires is that there is [sic] a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely; indeed his purpose, while settled, may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode. And there may well be many others. All that is necessary is that the purpose of living where one does has a

sufficient degree of continuity to be properly described as settled.

*Shah,* [1983] 1 All E.R. at 235.

This passage makes some intuitive sense. Being habitually resident in a place must mean that you are, in some sense, "settled" there—but it need not mean that's where you plan to leave your bones. Nor could we justify limiting habitual residence to persons who settle in an area for some particular motive. All of this is true. None of it is very useful, however, when attempting to decide a borderline case. Even the child who goes off to summer camp arguably has a "settled purpose" to live there continuously "for a limited period." *Id.* No one would seriously contend that the summer camp is the child's habitual residence, but the notion of "settled purpose" alone is powerless to tell us why not.[16]

The obvious reason why the camper is not regarded as habitually resident is that he already has an established habitual residence elsewhere and his absence from it— even for an entire summer—is no indication that he means to abandon it. Lord Brandon has discussed the distinction between abandoning a prior habitual residence and acquiring a new one:

> [T]here is a significant difference between a person ceasing to be habitually resident in country A, and his subsequently becoming habitually resident in country B. A person may cease to be habitually resident in country A in a single day if he or she leaves it with a settled intention not to return to it but to take up long-term residence in country B instead. Such a person cannot, however, become habitually resident in country B in a single day. An apprecia-

15. *See, e.g., Smith v. The Central Auth.,* No. AP 36/98, High Court, Christchurch, New Zealand (Mar. 2, 1999) ("[T]he fact and duration of residence in a country is not necessarily decisive, especially where a child comes from a settled long-term background and there is then a move, rather the intention which accompanies it is all important."); *Shah,* [1983] 1 All E.R. at 234 ("The significance of the adverb 'habitually' is that it recalls two neces-

sary features ... namely residence adopted voluntarily and for settled purposes."); *Cruse v. Chittum,* [1974] 2 All E.R. 940, 942–43 (Eng.Fam.Div.) (habitual residence requires an element of intention; the residence must not be temporary or of a secondary nature).

16. *Cf.* Bruch, note 8 *supra,* at 46 ("While useful in many particulars, [Lord Scarman's] gloss has also caused problems.").

ble period of time and a settled intention will be necessary to enable him or her to become so.

*C v S (minor: abduction: illegitimate child),* [1990] 2 All E.R. at 965. As this passage illustrates, the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.[17] Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration.[18] Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay

abroad originally intended to be temporary. Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended.[19] If you've lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence.[20] On the other hand, one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period.[21] Whether there is a settled inten-

17. This is consistent with the view held by many courts that a person can only have one habitual residence at a time under the Convention. *See, e.g., Friedrich,* 983 F.2d at 1401; *Freier v. Freier,* 969 F.Supp. 436, 440 (E.D.Mich.1996). The exception would be the rare situation where someone consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each. *See, e.g., Johnson v. Johnson,* 26 Va.App. 135, 493 S.E.2d 668, 669 (1997) (child had a fully established home in both Virginia and in New York); Beaumont & McEleavy, page 4 *supra,* at 110–11.

18. *See, e.g., Harkness, v. Harkness,* 227 Mich. App. 581, 577 N.W.2d 116, 123 (1998) (upholding trial court's finding that habitual residence had not changed because "the apartment in Germany was the last place the parties had resided together as a family unit," and "the court found no indication that the parties intended to abandon that residence and to establish a new residence in the United States."). Professor Bruch has suggested an analogous inquiry. *See* Bruch, note 8 *supra,* at 51 ("[R]ather than ask whether a 'settled purpose' is present, [courts] should ask instead whether a merely transitory, contingent, or other temporary purpose is apparent.").

19. *See, e.g., Zenel v. Haddow,* 1993 S.L.T. 975, 979 (Scot. 1st Div.) (respondent had renovated kitchen, considered purchasing a new home, and obtained full-time employment in new forum).

20. For an example of such a fact pattern, see *Y.D. v. J.B.* (Droit de la famille—2454), [1996] R.D.F. 512 (Quebec Super.Ct.) (children had lived continuously with both parents and attended school in California for three years). While the trial court in this case declared the only relevant question to be "where the children lived immediately before their removal," *id.* at 516, it nevertheless made what we

would call a finding of settled purpose, remarking that "the members of this family were neither visitors nor tourists in California." *Id. See also* Beaumont & McEleavy, page 1070 *supra,* at 94 ("[I]t would be difficult to affirm that whatever an individual's alleged intention he should not be connected to a country that has been his place of residence over a period of years."). *But see Director General et al and M.S.,* No. SY8917 of 1997, Family Court of Australia at Sydney, ¶ 86 (1998) (two years spent by mother and children in Austria lacked the "necessary settled purpose" to shift their habitual residence there).

21. The leading example of this is *Re Bates,* though one might characterize this case either as one in which the child had *no* prior habitual residence, ("Her life until now must have been the most nomadic almost, ever to have been experienced by any child of her age."), ¶ 10, or as one in which the child did have one, ("The father owns a house in London .... to which they have returned after overseas tours and during such brief respites as the father has enjoyed from his professional engagements...."), *id.,* but it was abandoned:

New York had by then become the city in which the mother wanted to stay and in which the father had reluctantly agreed to allow her to stay[, pending whatever] decision ... the parents then made about their personal lives, both generally in relation to the future of their marriage and specifically in relation to the problem of reconciling Tatjana's special needs with the demands of the father's working career.

*Id.* at ¶ 34. The important point is that focusing on the question of settled intent to abandon a prior habitual residence in those cases where one exists does not equate habitual residence to domicile, which requires "a combination of residence and intention of perma-

tion to abandon a prior habitual residence is a question of fact as to which we defer to the district court.

### B: Whose Intent Is It, Anyway?

Having concluded that a settled intention to abandon one's prior habitual residence is a crucial part of acquiring a new one, we confront an additional problem: Whose settled intention determines whether a *child* has abandoned a prior habitual residence? One obvious response would be, the child's. It is, after all, the child whose habitual residence we are out to determine. And indeed we sometimes find courts declaring the intentions of the parents to be irrelevant.[22] There is an obvious problem with this approach, however. Children, particularly the ones whose return may be ordered under the Convention,[23] normally lack the material and psychological wherewithal to decide where they will reside. This leads to the conclusion that, "in those cases where intention or purpose is relevant—for example, where it is necessary to decide whether an absence is intended to be temporary and short-term—the intention or purpose

which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence."[24]

Difficulty arises, of course, when the persons entitled to fix the child's residence no longer agree on where it has been fixed—a situation that, for obvious reasons, is likely to arise in cases under the Convention. In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is. The factual circumstances in which this question arises are diverse, but we can divide the cases into three broad categories.

On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move.[25] Most commonly, this occurs when both parents and the child translocate together under circumstances suggesting that they intend to make their home in the new

nent or indefinite residence." *Re B (minors) (abduction)*, [1993] 1 F.L.R. 993, 998 (Eng.Fam.Div.).

22. *See Friedrich*, 983 F.2d at 1401 ("To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions."). *See also Y.D. v. J.B.* (Droit de la famille— 2454), [1996] R.J.Q. 2509, 2523 (Quebec Ct. App.) ("La réalité des enfants doit seule être prise en compte pour déterminer le lieu de leur «résidence habituelle»; à cet égard ... les désirs, souhaits ou intentions de leurs parents ne comptant pas....").

23. If a child has attained the age of sixteen, the Convention no longer applies to it. *See* Convention, art. 4, 19 I.L.M. at 1501. Further, any child that has "attained an age and degree of maturity at which it is appropriate to take account of its views" may object to being returned and have its wishes considered. *Id.*, art. 13, 19 I.L.M. at 1502–03. Children who fall under neither of these provisions are clearly not in a position to make independent choices as to where they wish to reside. *Cf. Gonzalez v. Reno*, 212 F.3d 1338 (11th Cir.2000) (upholding INS determination

that six-year-old child lacked sufficient capacity to assert asylum claims unless represented by adult).

24. Clive, note 7 *supra*, at 144. *See also Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (determination of habitual residence requires analysis of "the parents' present, shared intentions regarding their child's presence"); *In re Application of Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993) ("Although it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored.... The concept of habitual residence must ... entail some element of voluntariness and purposeful design."). As Dr. Clive has pointed out, "[t]his is not to introduce a legal technicality into the law on habitual residence.... The technicality is already there in the law on decision making for children." Clive, note 7 *supra*, at 144–45.

25. *See* Clive, note 7 *supra*, at 145 ("In some cases it may be possible to conclude on the evidence that in fact they had the same intention.").

country. When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose.[26]

On the other side are cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period. In these cases, courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence.[27]

In between are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely.[28] When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred.[29] Clearly,

---

**26.** *See, e.g., Feder,* 63 F.3d at 224 ("That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve did not void the couple's settled purpose to live as a family in the place where [the husband] had found work."); *Walton v. Walton,* 925 F.Supp. 453, 457 (S.D.Miss.1996) ("Clearly, even if we accept Mrs. Walton's statement that she did not wish to move to Australia, it cannot be seriously argued that the move was portrayed to her as a mere visit .... the evidence does not support a finding that the Waltons' life in Australia ... lacked 'settled purpose.' "); *Prevot v. Prevot,* 855 F.Supp. 915, 920 (W.D.Tenn.1994) ("[T]he parties clearly went to France with the intention of settling there and opening a restaurant."), *overruled on other grounds,* 59 F.3d 556 (6th Cir.1995); *Harsacky v. Harsacky,* 930 S.W.2d 410, 415 (Ky.Ct.App.1996) ("[T]he Harsackys had the settled purpose of bringing their family to the United States in order to locate here on an indefinite basis in the hope that Mr. Harsacky could find employment."); *Re F (a minor) (child abduction),* [1992] 1 F.L.R. 548, 555 (Eng.C.A.1991) ("[T]he family did intend to emigrate from the UK and settle in Australia.").

**27.** *See, e.g., Pesin v. Rodriguez,* 77 F.Supp.2d 1277, 1285 (S.D.Fla.1999) (settled purpose of family trip was a vacation of finite duration); *In re Morris,* 55 F.Supp.2d. 1156, 1159 (D.Colo.1999) (when family left Colorado for 10–month teaching appointment in Switzerland, the parties had a "shared, settled intention to return to Colorado with the child," and mother's unilateral change of position could not make Switzerland the habitual residence); *Freier v. Freier,* 969 F.Supp. 436, 438 (E.D.Mich.1996) (when mother left with child, she informed father that she would be vacationing with parents for one month); *Flores v.*

*Contreras,* 981 S.W.2d 246, 248 (Tex.App. 1998) (mother brought child to Texas for two-week vacation); *Brennan v. Cibault,* 227 A.D.2d 965, 965, 643 N.Y.S.2d 780 (N.Y.App. Div.1996) (mother agreed that child should remain with father in New York for six months, but expected her to return to France on a specific date). Some periods, on the other hand, though sharply delimited, may be too long to expect children to live abroad without acquiring habitual residence. *See, e.g., Toren v. Toren,* 26 F.Supp.2d 240, 242 (D.Mass.1998) (parents had written agreement under which children were to live and study in the United States for four years, after which they were to return to Israel).

**28.** *See, e.g., Falls v. Downie,* 871 F.Supp. 100, 101 (D.Mass.1994) ("Falls understood when Downie left with Patrick that he and their child would be staying in the United States for an *indefinite* period of time."); *Slagenweit v. Slagenweit,* 841 F.Supp. 264, 269 (N.D.Iowa 1993) ("The parties mutually agreed that Sandra would remain in the custody of Steven for an indefinite period of time in Iowa."); *Levesque v. Levesque,* 816 F.Supp. 662, 667 (D.Kan.1993) ("[W]hen Britta and Vallery returned to Germany ... there was an intent to remain, at least for a period of time which was indefinite. This was by mutual agreement."); *Schroeder v. Perez,* 76 Ohio Misc.2d 25, 664 N.E.2d 627, 632–33 (Com.Pl. 1995) ("The parties had mutually agreed that Gabriela would remain in the custody of the plaintiff for an indefinite period in Ohio.").

**29.** *See, e.g., Meredith v. Meredith,* 759 F.Supp. 1432, 1433 (D.Ariz.1991) (petitioner suggested that respondent take children to France to visit her parents for unspecified period); *Harkness v. Harkness,* 227 Mich.App. 581, 577

this is one of those questions of "historical and narrative facts" in which the findings of the district court are entitled to great deference. *Feder*, 63 F.3d at 222 n. 9.

### C: Parental Intent and the Circumstances of the Child

While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone. First, it requires an actual "change in geography." *Friedrich*, 983 F.2d at 1402. Second, home isn't built in a day. It requires the passage of "[a]n appreciable period of time," *C v S (minor: abduction: illegitimate child)*, [1990] 2 All E.R. 961, 965 (Eng.H.L.), one that is "sufficient for acclimatization." *Feder*, 63 F.3d at 224. When the child moves to a new country accompanied by both parents, who

take steps to set up a regular household together, the period need not be long.[30] On the other hand, when circumstances are such as to hinder acclimatization, even a lengthy period spent in this manner may not suffice.[31]

A more difficult question is when evidence of acclimatization should suffice to establish a child's habitual residence, despite uncertain or contrary parental intent. Most agree that, given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary.[32] The question is how readily courts should reach the conclusion that this has occurred. Since the Convention seeks to prevent harms thought to flow from wrenching or keeping a child from its familiar surroundings, it is tempting to regard any sign of a child's

N.W.2d 116, 118–19 (1998) (children were left with respondent's parents in Michigan for eight months while both parents were in Germany); *Re A*, [1995] 1 F.L.R. at 773 (mother's agreement that child should attend school in Pakistan for two years while living with father's relatives was "temporary and conditional" and not sufficient to change the child's habitual residence); *Re S and another (minors) (abduction: wrongful detention)*, [1994] 1 All E.R. at 241 (Eng.Fam.Div.1993) (family moved from Israel to England, where parents each had one year teaching appointments, though "it was not beyond the realms of possibility that they would have stayed longer"). *See also* Beaumont & McEleavy, page 1070 *supra*, at 96 ("[A] child might leave with the consent of its primary carer to spend an extended, yet undefined, period of time with its other parent, but then not be returned. Prima facie, this would amount to a wrongful retention...."); Clive, note 7 *supra*, at 145:

> If ... there is a genuine difference [of parental intention] then the conclusion must be that there is no settled purpose or intention. The position is like that of an adult who cannot decide whether a move is short-term or long-term. In such a case the habitual residence would not be changed until a lengthy period of time had elapsed.

**30.** *See, e.g. Feder*, 63 F.3d at 219 (six months); *Harsacky*, 930 S.W.2d at 412 (four months); *Re F (a minor) (child abduction)*, [1992] 1 F.L.R. 548, 555 (Eng.C.A.) ("[T]he family did

intend to emigrate from the UK and settle in Australia. With that settled intention, a month can be, as I believe it to be in this case, an appreciable period of time.").

**31.** *See, e.g., In re Application of Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993) (habitual residence not acquired where mother and child were detained in forum against her desires for ten months by means of verbal, emotional, and physical abuse); *Director General et al and M.S.*, No. SY8917 of 1997, Family Court of Australia at Sydney, ¶¶ 28, 29 (1998) (habitual residence not acquired despite two years in Austria, where husband's family was hostile to wife, and wife and children were linguistically and socially isolated). Interestingly, even though these seem to be cases where a lack of effective acclimatization could easily have been found, the courts relied instead on failure of settled parental intent. *See In re Ponath*, 829 F.Supp. at 368 ("Petitioner's coercion of respondent by means of verbal, emotional and physical abuse removed any element of choice and settled purpose which earlier may have been present in the family's decision to visit Germany."); *Director General* at ¶ 91 ("Ultimately I am not persuaded on the evidence in this case that these parents ever formed a shared intention to remain in Austria and for it to be the permanent residence of these children.").

**32.** *See, e.g.,* Clive, note 7 *supra*, at 145.

familiarity with the new country as lessening the need for return and making a finding of altered habitual residence desirable. Further, some courts regard the question whether a child is doing well in school, has friends, and so on, as more straightforward and objective than asking whether the parents share a "settled intent."[33] Despite the superficial appeal of focusing primarily on the child's contacts in the new country, however, we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned.

The Convention is designed to prevent child abduction by reducing the incentive of the would-be abductor to seek unilateral custody over a child in another country. The greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try. The question whether a child is in some sense "settled" in its new environment is so vague as to allow findings of habitual residence based on virtually any indication that the child has generally adjusted to life there.[34] Further, attempting to make the standard more rigorous might actually make matters worse, as it could open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit—such as having the child profess allegiance to the new sovereign. *See* note 34 *supra*. The function of a court applying the Convention is not to determine whether a child is happy where it currently is, but whether one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life.[35]

Even if deliberate manipulation were not a danger, divining from a child's observed contacts in a new country whether it has come to reside there habitually would be an enterprise fraught with difficulty. Children can be remarkably adaptable and form intense attachments even in short periods of time—yet this does not necessarily mean that the child expects or intends those relationships to be long-lived. It is quite possible to participate in all the activities of daily life while still retaining awareness that one has another life to go back to. In such instances one may be "acclimatized" in the sense of being well-adjusted in one's present environment, yet not regard that environment as one's habitual residence.[36] It thus makes sense to regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident,[37] because the child's knowledge of these inten-

33. *See, e.g., Y.D. v. J.B.* (Droit de la famille—2454), [1996] R.J.Q. 2509, 2523 (Quebec Ct. App.) ("L'approche axée sur la réalité que vivent les enfants permet d'éviter d'avoir à sonder les reins et les coeurs des parents."); *Shah*, [1983] 1 All E.R. at 235–36 ("The legal advantage of adopting the natural and ordinary meaning ... is that it results in the proof of ordinary residence ... depending more on the evidence of matters susceptible of objective proof than on evidence as to state of mind.").

34. *See, e.g., Brooke v. Willis*, 907 F.Supp. 57, 61 (S.D.N.Y.1995) (finding that a six-year-old child had acquired habitual residence during a summer spent in England, because the child was "well accustomed to her surroundings," had been "happy and well taken care of during her stay," and "even stood in the town square with a flag in hand and recited the British Pledge of Allegiance").

35. *See* 42 U.S.C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.").

36. *See* Beaumont & McEleavy, page 1070 *supra*, at 97 ("Logic would suggest that connections with the former State of residence will weaken slowly, while assimilation in the new State will progressively increase.").

37. *See, e.g.,* Clive, note 7 *supra*, at 145:
The truth of the matter, it seems to me, is that where both parents have the right to fix the child's place of residence and where they are not in agreement on that question, there is a lack of the type of settled intention which enables habitual residence to be changed quickly. Accordingly it will take a considerable period of time for a child to acquire a new habitual residence after a wrongful removal.

tions is likely to color its attitude toward the contacts it is making.[38]

As these considerations illustrate, the broad claim that observing "la réalité que vivent les enfants" obviates any need to consider the intent of the parents, *Y.D.*, [1996] R.J.Q. at 2523, is unsound. It also runs counter to the idea that determinations of habitual residence should take into account "all the circumstances of any particular case." *C v. S*, [1990] 2 All E.R. at 965. It is easy enough for a court to eschew inquiry into parental intent in cases where other factors are conclusive. But just as hard cases make bad law, easy cases can make for overly broad law—particularly when unqualified statements come to be applied outside of the factual contexts that inspired them. In *Friedrich*, for example, the court's statement that we must "focus on the child, not the parents," 983 F.2d at 1401, came in response to the claims of a mother that her child was habitually resident in the U.S. even though it had always lived in Germany, because she *intended* to move there with it upon discharge from the military. *See id.* All the *Friedrich* court needed to say in order to reach the correct and obvious result was that, whatever the parents' intent, habitual residence cannot be acquired without physical presence. The facts of *Friedrich* thus provided no legitimate occasion for a broad pronouncement that parental intent

is irrelevant to the question of habitual residence.[39]

Similarly, the Quebec Court of Appeal in *Y.D.* made a rhetorical argument against the use of parental intent in general,[40] based on a conflict that most courts would consider trivial. Both parents had moved to California with their children and lived with them there continuously for three years, leaving behind no possessions in Canada. *See Y.D.*, [1996] R.J.Q. at 2516. When the marriage deteriorated, one parent claimed that the stay had been intended to be temporary. *See id.* There is little room for doubt that the children had become acclimatized in California, but the same facts also support a finding that the couple had manifested a shared intent to abandon the family's prior habitual residence.[41] *Y.D.*, then, does not illustrate the superiority of focusing exclusively on the circumstances of the child; it illustrates that easy cases are easy, however one analyzes them.

Recognizing the importance of parental intent, some courts have gone off in the other direction, announcing a bright line rule that "where both parents have equal rights of custody no unilateral action by one of them can change the habitual residence of the children, save by the agreement or acquiescence over time of the other parent...." *Re S and another (minors) (abduction: wrongful detention)*, [1994] 1 All E.R. 237, 249 (Eng.Fam.Div.).

---

38. Cf. Beaumont & McEleavy, page 1070 *supra*, at 92 (" 'In the case of children ... their relationship with their parents ... provides the ties which establish the habit of so residing irrespective of their intentions, likes and dislikes.' ") (citation omitted).

39. Cf. *Walton v. Walton*, 925 F.Supp. 453, 457 (S.D.Miss.1996) ("Probably the most confusing, though often quoted, statement regarding how one determines habitual residence is that penned by the *Friedrich* court....").

40. La sagesse de l'approche axée sur la réalité des enfants, plutôt que sur les intentions des parents, saute aux yeux dans un cas comme celui-ci; madame n'a pas l'intention de demeurer plus longtemps en Californie, monsieur oui. L'intention duquel des deux parents dev-

rait prévaloir pour déterminer le lieu de la "résidence habituelle" des enfants? L'approche axée sur la réalité que vivent les enfants permet d'éviter d'avoir à sonder les reins et les coeurs des parents.

*Y.D.*, [1996] R.J.Q. at 2523.

41. *See, e.g.*, cases cited in note 26, *supra*. The Quebec court's comment about "reins" and "coeurs", *Y.D.*, [1996] R.J.Q. at 2523, demonstrates undue skepticism toward judicial inquiry into intent, which is a routine and indispensable aspect of many legal doctrines, such as the distinction between murder and manslaughter. Such inquiry does not, as the Quebec court suggests, require exploratory surgery, only attention to the objective manifestations of intent found in words and deeds.

While this rule certainly furthers the policy of discouraging child abductions, it has been criticized as needing to be "carefully qualified if it [is] not to lead to absurd results."[42] The point is well taken: Habitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent. Even when there is no settled intent on the part of the parents to abandon the child's prior habitual residence, courts should find a change in habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.). The question in these cases is not simply whether the child's life in the new country shows some minimal "degree of settled purpose," *Shah*, [1983] 1 All E.R. at 235, but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child "out of the family and social environment in which its life has developed." Perez–Vera Report, page 1069 *supra*, at ¶ 11.

## V

█ The district court held that the habitual residence of the Mozes children had shifted from Israel to the United States between April 1997 and April 1998. It did so based on the following understanding of the applicable standard:

> [T]o establish that the habitual residence of a child has shifted, the law requires that a ·child be in the new forum by mutual consent of the parents and that the child has become settled in that new forum.

*Mozes*, 19 F.Supp.2d at 1115. As we have explained, this formulation does not reflect certain considerations that other courts applying the Convention have, for good reason, recognized. Where, as here, children already have a well-established habitual residence, simple consent to their presence in another forum is not usually enough to shift it there. Rather, the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration.

Here, the district court's findings of fact with regard to the shared intentions of the parents, findings to which we defer, were as follows:

> The parties stipulate that they agreed that the children would remain in the United States until July 1998. However, there is a dispute as to whether the parties agreed that the date of return had been extended to July 1999, if it had become indefinite or remained unchanged. At the very least, the parties discussed the possibility of the children remaining in the United States for another year, and may have even come to such an understanding. In April 1998, it is clear that petitioner decided he wanted the children to return to Israel as originally planned by July 1998.

*Mozes*, 19 F.Supp.2d at 1115–16. Absent from this discussion is a finding that the parents shared an understanding that their children's stay in the United States would last indefinitely. Having heard the conflicting testimony of both parties and reviewed all the evidence, the district court was able to say only that Arnon and Michal had "discussed the possibility" of extending the stay for one additional year, and that they "*may* have even come to such an understanding." *Id.* (emphasis added).[43] The district court did not find that they had actually reached such an understanding.

---

**42.** Clive, note 7 *supra*, at 145:
Suppose, for example, that a child has lived for 15 years in a new country after a wrongful removal. It would be an abuse of ordinary language to say that the child had been habitually resident for all of that time in the country from which he or she had been removed and had not become habitually resident in the new country.

**43.** *Cf.* cases cited in note 29, *supra*.

The district court's reticence is not surprising, given the striking difference between this case and those where courts faced with similarly ambiguous facts have found a settled intent in favor of indefinite residence. In those cases, the country in which it had been agreed the child should spend time was the native country of one of the parents.[44] It is entirely natural and foreseeable that, if a child goes to live with a parent in that parent's native land on an open-ended basis, the child will soon begin to lose its habitual ties to any prior residence. A parent who agrees to such an arrangement without any clear limitations may well be held to have accepted this eventuality.

The situation here is far different. Michal had never lived in the United States. Prior to their departure, all of her life and the lives of the children had been spent in Israel. All of the family's relatives were there. Further, Michal and the children left for the United States with a temporary visa, casting considerable doubt on whether they would be allowed to remain here indefinitely even if they wished to.[45] Finally, while Michal took steps to obtain work in the United States, the economic base on which the family depended for

sustenance remained entirely in Israel. Under these circumstances, the district court was clearly right to refrain from finding that the parents had agreed to an indefinite stay.

 The district court reasoned, however, that "[t]he fact that a child is to remain indefinitely in a new forum ... is not a necessary condition to establishing the habitual residence of a child." *Mozes*, 19 F.Supp.2d at 1115. This is true; it is not a *necessary* condition. When a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time.[46] The same is true if the child's prior habitual residence has been effectively abandoned by the shared intent of the parents. Where there is no such intent, however, a prior habitual residence should be deemed supplanted only where "the objective facts point unequivocally" to this conclusion. *Zenel*, 1993 S.L.T. at 979. This, too, may occur during the course of a stay which is not intended to be indefinite.[47]

 The objective facts found here are as follows:

[B]y April 17, 1998, the children had settled into their new home, were enrolled and participating full time in

44. *See e.g., Falls*, 871 F.Supp. at 101 (child went to live with father and father's parents in their home community of western Massachusetts); *Slagenweit*, 841 F.Supp. at 265–66 (child moved to United States with father, who was U.S. citizen); *Levesque*, 816 F.Supp. at 663 (mother took child back to its birthplace in Germany, where the mother's grandmother still resided); *Schroeder*, 664 N.E.2d at 632–33 (child lived with mother and mother's relatives in Ohio).

45. While an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly. *See* Clive, note 7 *supra*, at 147. It is also a highly relevant circumstance where, as here, the shared intent of the parents is in dispute. *See, e.g., In re Morris*, 55 F.Supp.2d. 1156, 1158–59 (D.Col.1999) (noting that the family lacked Swiss citizenship and passports, and rejecting the mother's testimony that she intended to abandon habitual residence in Colo-

rado when moving from there to Switzerland). Conversely, had Arnon helped Michal obtain a permanent residence visa for herself and the children, we could infer his consent to a residence of indefinite duration.

46. *See, e.g., Re A and others (minors) (abduction: habitual residence)*, [1996] 1 All E.R. 24, 32 (Eng.Fam.Div.) (family who took up residence at U.S. military base in Iceland "had no home base of their own elsewhere"); *Re Bates*, No. CA 122/89 at ¶ 10 (prior to taking up residence in New York apartment for three months, child's life had been "the most nomadic almost, ever to have been experienced by any child of her age").

47. *See, e.g., Johnson v. Johnson*, No. 7505–1995 (Swed.Sup.Admin.Ct.1996) (child had been living with mother in Sweden for more than two years, under an alternating custody agreement which provided that the child would spend eight years there and four in the United States).

schools and social, cultural, and religious activities. They had successfully completed a year of school in the United States, quickly learned English, made new friends, and were accustomed to and thriving in their new life in Beverly Hills.

*Mozes*, 19 F.Supp.2d at 1116. These facts certainly show that the Mozes children, as the district court remarked, spent a "very full year" in the United States. *Id.* But they do not point unequivocally to the conclusion that, at the time Michal petitioned for their custody, the children had ceased to be habitually resident in Israel.

The academic year abroad has become a familiar phenomenon in which thousands of families across the globe participate every year. Older children sometimes do so through organized exchange programs;[48] informal arrangements among friends or relatives may include children who are much younger.[49] Children who spend time studying abroad in this manner are obviously expected to form close cultural and personal ties to the countries they visit—that's the whole point of sending them there for a year rather than simply for a brief tourist visit. Yet the ordinary expectation—shared by both parents and children—is that, upon completion of the year, the students will resume residence in their home countries. If this were not the expectation, one would find few parents willing to let their children have these valuable experiences. The Mozes children departed from Israel with this normal expectation, and there is no evidence that anyone questioned it until their mother decided to file for divorce. The case, then, does not reflect the sort of "brute facts" that require a finding of altered habitual residence so as to avoid an "absurd result[ ]." Clive, note 7 *supra*, at 145–46.

The district court appears to have believed that its decision should be governed by a number of cases in which temporary stays abroad resulted in a change of habitual residence. *See Mozes*, 19 F.Supp.2d at 1114–15 (citing *Zenel v. Haddow*, 1993 S.L.T. 975; *Johnson v. Johnson*, No. 7505–1995 (Swed.Sup.Admin.Ct.1996); *Re A and others (minors) (abduction: habitual residence)*, [1996] 1 All E.R. 24 (Eng.Fam.Div.); *Re S (a minor) (abduction)*, [1991] 2 F.L.R. 1 (Eng.C.A.)). Three of these cases involved factual situations significantly different from that presented here.

In *Zenel* and *Re A and others*, both parents had resided together with the child for an extended period in the forum found to be the habitual residence. In *Zenel*, both parents had lived in Australia continuously for fifteen months, during which they had made renovations to the house they lived in, and considered purchasing another home elsewhere in the country. *See Zenel*, 1993 S.L.T. at 979. Five months prior to her sudden decision to remove the child to Scotland, the mother herself had obtained full-time employment in Australia. *See id.* These are the sorts of objective actions that ordinarily lead courts to find a settled intent on the part of a family to take up habitual residence. In *Re A and others*, the family had lived together in Iceland for two years, and the court found that, while the stay was not expected to last indefinitely, "[t]hey had no home base of their own elsewhere." [1996] 1 All E.R. at 32.

In *Johnson*, the child had lived with its mother for over two years in Sweden, pursuant to a custody arrangement under which it was to spend a total of eight years there.[50] Its acquisition of a habitual resi-

---

**48.** The Rotary and AFS Youth Exchange Programs alone send annually over 14,000 students aged 15 and older to study and live for a year in foreign countries. *See* information available at <*http://www.rotary.org* > and <*http://www.afs.org* >.

**49.** *See, e.g., Re A (Wardship: Jurisdiction)*, [1995] 1 F.L.R. 767, 770, 773 (Eng.Fam.Div.) (eight-year-old child sent to live and study with father's family in Pakistan had not lost habitual residence in England after one year).

**50.** *See Johnson* at ¶ 22. Indeed, had the custody agreement been followed, the child

dence in Sweden was thus surely contemplated by the parties. In *Re S*, the court took a position which we have rejected above: that an agreement to let a child spend a school year abroad is sufficient to transfer its habitual residence after only four months. *See Re S*, [1991] 2 F.L.R. at 1, 20.

In conclusion, the district court's determination of habitual residence in this case appears to have relied upon an understanding of that term that gives insufficient weight to the importance of shared parental intent under the Convention. Given that the Mozes children had a clearly established habitual residence in Israel in April 1997, and that the district court did not find an intent to abandon this residence in favor of the United States, the question it needed to answer was not simply whether the children had in some sense "become settled" in this country. Rather, the appropriate inquiry under the Convention is whether the United States had supplanted Israel as the locus of the children's family and social development. As the district court did not answer this question, we must remand and allow it to do so.

## VI

Given the need to resolve these regrettably prolonged proceedings as expeditiously as possible,[51] judicial economy counsels that we address certain issues the district court may confront on remand. Should the district court, after considering our discussion of the applicable principles, reaffirm its holding that the children's habitual residence had shifted to the United States by April 17, 1998, the case should end there. If, on the other hand, the district court decides that the facts do not warrant such a finding, it will have to resolve a series of additional questions. The first of these is whether the retention breached rights of custody attributed to Arnon under Israeli law.[52] *See* pages 1070–71 *supra*. Only if this is the case is the retention wrongful under Article 3 of the Convention. *See* Convention, art. 3, 19 I.L.M. at 1501.

Article 14 of the Convention provides that we may take direct judicial notice of the law of the habitual residence in order to answer this question.[53] The applicable Israeli law, in turn, states that "[i]n any matter within the scope of their guardianship the parents shall act in agreement." Capacity and Guardianship Law, 1962, 16 L.S.I. 106, 108 (1961–62) (Section 18). By seeking sole custody over the children outside their state of habitual residence then, Michal "disregarded the rights of the other parent which are also protected by law, and ... interfered with their normal exercise." Perez–Vera Report, page 1069 *supra*, at ¶ 71.[54] Nor is there any doubt that

would have spent regularly alternating periods with each parent, *see id.* at ¶ 3, and might thus have acquired dual habitual residences. *See* Beaumont & McEleavy, page 1070 *supra*, at 110 (arguing that such a conclusion may in certain cases be theoretically appropriate, and would not call for return under the Convention).

**51.** *See* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

**52.** Since some jurisdictions recognize the custody rights of parents as joint and several, it is possible for the unilateral retention of a child in a foreign jurisdiction to be irremediable under the Convention. *See* Beaumont & McEleavy, page 1070 *supra*, at 62.

**53.** In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

Convention, art. 14, 19 I.L.M. at 1503.

**54.** When parents who do not live together fail to agree on matters within the scope of their guardianship, the Israeli courts are to determine them in the best interests of the children. *See* Capacity and Guardianship Law, 16 L.S.I. at 109–10 (Section 25). By seeking to have this determination made in the United States rather than in the country of the

Arnon was exercising his parental rights and responsibilities up until the time Michal sought custody. As the district court noted, he had remained in regular contact with his family, visited them several times, and "provided all finances needed to support his wife and children in California." *Mozes*, 19 F.Supp.2d at 1111. This means that if the children's habitual residence was still in Israel on April 17, 1998, their retention here would be wrongful under the Convention, and the United States would be required under Article 12 to order their return forthwith so that an Israeli court may consider the question of custody.[55]

children's habitual residence, Michal did precisely what the Convention was intended to prevent. *See* Perez–Vera Report, page 1069 *supra*, at ¶¶ 13, 16.

**55.** We take judicial notice of the fact that, after the district court decided the case and while it was on appeal before us, the Los Angeles Superior Court entered an award in the custody proceeding which it had previously stayed pending resolution of Arnon's claim in the district court. Article 16 of the Convention provides, in pertinent part, that "[a]fter receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained *shall not* decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention ...." Convention, art. 16, 19 I.L.M. at 1503 (emphasis added). Because it has not yet been determined whether the Mozes children must be returned under the Convention, the Superior Court's custody decree is premature. We presume that the Superior Court, or the district court on remand, will take appropriate steps to ensure its compliance with the Convention.

It is worth noting that the district court would not be barred by the *Rooker–Feldman* doctrine from vacating the Superior Court's custodial decree or its order enjoining removal of the children from California. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923) (holding federal statutory jurisdiction over direct appeals from state courts beyond the original jurisdiction of federal district courts); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486–87, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (holding that claims "inextricably in-

Article 13 of the Convention, however, provides certain exceptions to the duty to return a wrongfully retained child to its state of habitual residence.[56] Because the district court decided that there was no wrongful retention under Article 3, it had no occasion to examine whether any of these exceptions were applicable. Unlike Article 3, which restricts a court's inquiry to the state of affairs prevailing immediately prior to the retention or removal alleged to be wrongful, *see* page 1070 *supra*, two of the exceptions in Article 13—namely, the risk of physical or psychological harm and objection by a mature child to its return—depend on circumstances at

tertwined" with those a state court has already decided beyond the jurisdiction of lower federal courts). Because the doctrine is one of congressional intent, not constitutional mandate, it follows that where Congress has specifically granted jurisdiction to the federal courts, the doctrine does not apply. *See, e.g., In re Gruntz*, 202 F.3d 1074, 1078–79 (9th Cir.2000) (en banc) (noting that through statutory writ of habeas corpus and bankruptcy statutes Congress permits federal collateral review of state court and criminal bankruptcy judgments). In this case, Congress has expressly granted the federal courts jurisdiction to vindicate rights arising under the Convention. *See* 42 U.S.C. § 11603(a). Thus, federal courts must have the power to vacate state custody determinations and other state court orders that contravene the treaty.

**56.** Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—

a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

the time a child's return is to be ordered.[57] Should the district court find a wrongful retention to have occurred, it must make a prompt determination as to whether either of these exceptions is applicable [58] and, if not, order the return of the children to Israel forthwith.

**REVERSED** and **REMANDED.**

The mandate shall issue at once. Fed. R.App.P. 2.

---

Convention, art. 13, 19 I.L.M. at 1502.

**57.** The remaining exception is clearly inapplicable. As we have pointed out above, the district court found that Arnon continued to exercise his parental rights up until the time of the retention. *See* page 44 *supra.* Given that he has litigated continually for the children's return since then, he obviously has not "subsequently acquiesced" in their retention. Convention, art. 13, 19 I.L.M. at 1502.

**58.** In making the first of these determinations, the district court must be mindful that it is not deciding the ultimate question of custody, or even permanent return of the children to Israel. *That* decision will be made by the appropriate Israeli tribunal. The district court must determine only whether returning the children to Israel for long enough for the Israeli courts to make the custody determination will be physically or psychologically risky to them.