In re Application of Ezra
SASSON, Petitioner,

v.

Miriam SASSON, Respondent.

No. CIV.03–4385 WGB.

United States District Court,
D. New Jersey.

July 30, 2004.

Walter A. Lesnevich, Esq., Lesnevich & Marzano–Lesnevich, River Edge, NJ, for Petitioner.

Karin Duchin Haber, Esq., Haber & Silver, Florham Park, NJ, for Respondent.

*OPINION*

BASSLER, District Judge.

On September 17, 2003, Petitioner Ezra Sasson ("Petitioner") filed in this Court a Verified Complaint and Petition for the Return of Child (his daughter Maya Sasson) pursuant to the Hague Convention On the Civil Aspects of International Child Abduction ("the Hague Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.* ("ICARA").[1]

After the parties conducted expedited discovery, the Court held an evidentiary hearing on July 20, 21, and 22, 2004. Having heard testimony and reviewed the relevant submissions, the Court now makes the following findings of fact[2] and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[3] For the following reasons, the Court finds that Maya Sasson's habitual residence is the United States and accordingly, **denies** Petitioner's Petition for the Return of Child.

1. The Court has jurisdiction pursuant to 42 U.S.C. § 11603.

2. In evaluating the evidence of record, the Court undertook an individualized assessment of the credibility of each witness, and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. These findings of fact were made despite the fact that the testimony of the witnesses at times conflicted. In assessing the credibility of each witness in this case, the Court has taken into consideration how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness' testimony was considered in light of all the evidence in the case, 9A Wright & Miller, *Federal Practice and Procedure:* Civil 2d § 2585 (1995); *see also Miller v. Mercy Hospital, Inc.,* 720 F.2d 356, 365 (4th Cir.), *cert. denied,* 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985) ("Credibility involves more than a witness' demeanor and comprehends an overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence"), and whether the witness' testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence.

In general, unless otherwise noted, the Court found Respondent Miriam Sasson to be the more credible witness and credited her testimony over that of Petitioner Ezra Sasson given numerous inconsistencies or contradictions between statements in his sworn affidavit and his trial testimony. For example, contrary to Petitioner's contention that he could not speak English, it was evident from the testimony of numerous witnesses that Petitioner spoke English well enough to communicate to people who spoke little or no Hebrew, purchase a television, obtain cell phones, and open a bank account.

3. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I. *FINDINGS OF FACT*

### A. *Facts*

Petitioner is an Israeli citizen domiciled in Ramat Gan, Israel. Respondent Miriam Sasson ("Respondent") is an Israeli citizen currently living in New Jersey.

Petitioner and Respondent were married in Israel on April 13, 1995. Their daughter, Maya (a/k/a Maia) Sasson ("Maya") was born on May 11, 1996 in Israel. Petitioner has two sons from a former marriage, Ohad and Adi.

The first time that Petitioner visited the United States was with Respondent and his three children in or around December 1999. Petitioner thought the United States was a beautiful place to visit as a tourist. Respondent, however, testified that her husband loved the United States from the minute he arrived here and that he told her he would figure out a way for them to move to the United States.

In August of 2000, Petitioner returned to the United States alone for business. Petitioner's business involves building models and prototypes for the paramedical industry and defense systems, including improving engines for drones.[4] During that visit, Petitioner met with people in the United States Navy at a naval base in Baltimore, Maryland.

The parties agree that their marriage was an unhappy one, for which they underwent marital counseling. Then, sometime in the summer of 2002, Petitioner contends that Respondent conditioned any efforts to salvage the marriage on going to the United States. Thus, Petitioner claims that because he had no other choice, he agreed to come to the United States for a "prolonged period of time" to try to rehabilitate his marriage. Petitioner thought the length of time they would stay in the United States would depend on how well the marriage went—between a few months to a half a year, or maybe even longer.

In contrast, Respondent denies placing any conditions on coming to the United States, and maintains that in fact, Petitioner told her that he wanted to move to the United States because he believed that here, they would have a better life with less stress.

In any event, for whatever reason, whether prompted by Petitioner or by Respondent, on October 8, 2002, Petitioner, Respondent, Maya, Ohad, Adi ("the Sassons") traveled from Israel to Florham Park, New Jersey on B–1 non-immigrant tourist visas that were to expire in April of 2003. Petitioner purchased round-trip plane tickets for that trip. According to the plane tickets, the Sassons were to return to Israel on October 21, 2004. At the airport, Petitioner told the United States immigration officer that the purpose of his family's trip to the United States was to see relatives and to visit Disney World as a Bar Mitzvah gift for his son, Adi.

Prior to coming to the United States on October 8, 2002, Petitioner sold his house in Moshav Eshtaol, two cars, a majority of his home furnishings and furniture, as well as a portion of his business equipment. While there was conflicting testimony at the evidentiary hearing as to when the house was placed on the market, and when the closing on the house actually occurred, what is clear is that the Sassons moved out of the house in Moshav Eshtaol sometime in August of 2002.

The Sassons then moved into an apartment in Beit Shemesh, Israel, where the Sassons lived in August and September, 2002 until they left for the United States in

---

4. "Drones" are defined in Merriam–Webster Online Dictionary as "an unmanned airplane, helicopter, or ship guided by remote control."

October 2002. Although Petitioner signed a one year lease for the apartment, he subsequently sublet the apartment.

Additionally, prior to leaving for the United States, in October of 2002, Petitioner had most of his wife's paintings (Respondent is an artist) shipped to the United States. Also, sometime in July of 2002, Petitioner retained an attorney in Florida, Diana Boruchin, Esq. (*See* Trial Ex. D–4.) Petitioner hired Boruchin to file an L–1 business visa [5] on his behalf, to apply for the "Immigration Lottery" [6] on his behalf and on behalf of his wife, to prepare a work visa for his wife, to incorporate for him a company in the United States called S.E. Technologies and Prototypes, Inc., ("S.E.Technologies"), and to help prepare a business plan. (*See* Trial Exs. D–3 through D–7.)

The Sassons arrived in the United States in October 2002 with books, clothes, documents, money, and small business equipment that Petitioner needed to work. Once they arrived, Petitioner obtained an Employer Identification Number ("EIN") for his company, S.E. Technologies. (*See* Trial Ex. D–8.) Petitioner also signed a one year lease for an apartment at Sun Valley Plaza in Florham Park, New Jersey ("Sun Valley"), beginning on October 1, 2002 (*see* Trial Ex. D–2), opened a savings and checking bank account at Commerce Bank, (*see* Trial Ex. D–9), purchased two

vehicles—a Jeep Grand Cherokee (in which Petitioner had GPS (Global Positioning System) installed) and a Chrysler, obtained car insurance through October 2003, purchased two cellular telephones, bought an American television, and arranged for cable television. Petitioner paid his bills and the rent by check. In January 2003, Petitioner also paid for a one-year membership in the Jewish Community Center ("JCC") in West Orange for his family.

Because Petitioner wanted his children to obtain a Hebrew education, he and Respondent met a number of times with the Director of Admissions at Solomon Schechter Day School, a Jewish school affiliated with a conservative movement. At that time, tuition at Solomon Schechter was $14,000 per year at the high school level and $8,000 or $9,000 for the lower level, kindergarten through fifth grade. However, based on placement tests that Ohad and Adi took, the school determined that the two boys did not know enough English and would be better served in public school where they had a better ESL (English as a Second Language) program. Consequently, Petitioner and Respondent enrolled Ohad in Hanover Park High School, Adi in Ridgedale Middle School, and Maya in Brooklake Elementary School. In January 2003, Petitioner completed a form listing courses for Adi's expected enrollment in Hanover Park High

---

**5.** An L–1 visa is a non-immigrant, temporary visa, which enables a person to work in the United States for up to seven years. To qualify for an L–1 visa, the applicant must have worked for one continuous year within the preceding three years, in a managerial, executive, or specialized knowledge capacity for a foreign corporation that has a United States affiliate. L–1 visa holders are exempted from the requirement of having to establish their continued non-immigrant intent, which eases the transition to an immigrant employment visa and eventually to a "green card." *See* 8 U.S.C. § 1101(a)(15)(L); *see also* http://www.immihelp.com/visas/llvisa.html

**6.** The "Immigration Lottery" is otherwise referred to as the Diversity Visa Lottery Program ("DV"). The State Department's DV program makes 55,000 immigrant visas available through a lottery to people who come from countries with low rates of immigration to the United States. Those receiving visas through the DV program are authorized to live and work permanently in the United States and may bring their spouses and any unmarried children under the age of 21. *See* 8 U.S.C. § 1153; *see also* http://uscis.gov/graphics/services/residency/divvisa.htm

School in the fall of 2003. (*See* Trial Ex. D–11.)

About three months after arriving in the United States, Petitioner and Respondent's marriage began to deteriorate. On April 3, 2003, Petitioner went back to Israel with his two sons, Ohad and Adi. According to his own testimony, Petitioner told his wife that he would return to the United States in three weeks. He also informed her that when he came back from his business trip to Israel, due to the deterioration of their marriage, he would live elsewhere while she remained living at Sun Valley. Petitioner further acknowledged that he had intended to take all three of his children back to Israel and therefore had taken Maya's passport with him. Nevertheless, Petitioner admitted that he lied to Respondent and told her that he only planned to take his two sons. Petitioner ultimately decided not to take Maya with him to Israel because he concluded that his wife would scream and yell, making a scene, and that that would upset or traumatize Maya, which he wanted to avoid. Petitioner testified that he thought he would obtain custody of Maya through the legal process.

During the nearly seven month stay in the United States, Petitioner did not take his son, Adi, to Disney World as he had told the immigration officer that he intended to do.

Maya is still enrolled in the Brooklake Elementary School and has started religious classes in Hebrew school at Temple Beth Shalom in Livingston, New Jersey. Since January or February 2003, Maya began swimming regularly at the JCC and continues to swim there. She also is currently enrolled in karate classes at the JCC. She now reads and speaks English well. Maya can speak Hebrew, but cannot read or write it. Maya also has friends in her neighborhood with whom she speaks English. She is close to her maternal aunts and uncles, as well as her cousins.

### B. *Procedural History*

On May 21, 2003, Respondent brought an action in Superior Court for custody of Maya. By Order entered on June 19, 2003, the state court granted Respondent sole legal and residential custody pendente lite. Respondent has not yet taken any action to obtain permanent custody of Maya because Petitioner failed to respond in the child custody suit.

Meanwhile, on or about June 6, 2003, Petitioner filed with the U.S. Central Authority a Request Pursuant to the Hague Convention, seeking the return of Maya. On September 17, 2003, Petitioner filed this Petition seeking the return of his daughter to Israel pursuant to the Convention and ICARA. Shortly thereafter, on September 24, 2003, Petitioner filed an Order to Show Cause For a Preliminary Injunction (1) Preventing The Removal of the Child to Another Jurisdiction, (2) Staying the State Action for Custody, and (3) Providing Expedited Discovery. After hearing oral argument on November 25, 2003, the Court denied Petitioner's request for a preliminary injunction due to the existence of factual disputes, granted the request for expedited discovery, and denied as moot Petitioner's request for a stay of the state custody action.

## II. *CONCLUSIONS OF LAW*

### A. *Framework for The Hague Convention*

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble. Both the

United States and Israel are signatory nations.

The Hague Convention, which is implemented by ICARA, 42 U.S.C. § 11601, *et seq.,* "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see also Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993).

■ In an action brought pursuant to the ICARA and the Hague Convention, the petitioner bears the burden to show by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). The Hague Convention considers the removal of a child to be wrongful when:

> *a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> *b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in subparagraph *a* above may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, Article 3. For purposes of the Hague Convention, " 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." [7] Hague Convention, Article 5. "Removal or retention under the [Hague] [C]onvention is only wrongful if the child is removed from his or her 'habitual residence.'" *Delvoye v. Lee,* 224 F.Supp.2d 843, 847 (D.N.J.2002) (citing *Friedrich,* 983 F.2d at 1400)), *aff'd,* 329 F.3d 330 (3d Cir.2003)).

If the petitioner meets his burden, then the respondent opposing the return of the child must establish one of four affirmative defenses:

> 1) by clear and convincing evidence that there is a grave risk that the return of the child would expose the child to physical or psychological harm; Hague Convention, Article 13b, 42 U.S.C. § 11603(e)(2)(A);
>
> 2) by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms"; Hague Convention, Article 20, 42 U.S.C. § 11603(e)(2)(A);
>
> 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment; Hague Convention, Article 12, 42 U.S.C. § 11603(e)(2)(B); or
>
> 4) by a preponderance of the evidence that [the petitioner] was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; Hague Convention, Article 13a, 42 U.S.C. § 11603(e)(2)(B).

*Friedrich,* 983 F.2d at 1400.

In this case, Respondent concedes that none of these four affirmative defenses are at issue here.

---

**7.** In the present action, the parties stipulate that both parents are Maya's guardians and as such, have the right to determine her place of residence.

### B. *Analysis of "Habitual Residence" Under The Hague Convention*

The question of Maya's "habitual residence" immediately prior to her retention in New Jersey is the threshold issue that this Court must determine. *See Feder v. Evans–Feder*, 63 F.3d 217, 222 (3d Cir. 1995).

Although the Hague Convention does not provide a definition for "habitual residence", the Third Circuit has defined it as

> the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective.... [A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Id.* at 224. "The determination of a person's habitual residence is a mixed question of fact and law." *Delvoye v. Lee*, 329 F.3d 330, 332 (3d Cir.2003).[8]

In *Feder*, the parents, Mr. and Mrs. Feder, who were American citizens, moved with their only child, Evan, from Pennsylvania to Australia due to a job opportunity for Mr. Feder. While Mr. Feder viewed the move to Australia with enthusiasm, Mrs. Feder was reluctant. Nonetheless, once in Australia, the Feders purchased a house, Evan attended nursery school and was enrolled to begin kindergarten the following year. Mrs. Feder applied to have Evan admitted to a private school

when he reached the fifth grade, some seven years later. Mrs. Feder, who was an opera singer, also accepted a role in one of the Australian Opera Company's performances set for the following year.

Although Mrs. Feder had had doubts about the deteriorating marriage while living in the United States, it was only after moving to and living in Australia for about five or six months that she decided to leave her husband and return to the United States with Evan. However, believing that Mr. Feder would not agree to her plans, Mrs. Feder told her husband that she was going to take Evan to visit her parents in Pennsylvania. Mr. Feder made travel arrangements, buying two round-trip tickets to the United States.

Subsequently, Mrs. Feder filed a complaint in the Court of Common Pleas of Montgomery County, Pennsylvania, seeking a divorce, property distribution, custody of Evan, and financial support. Mr. Feder commenced a proceeding in the Family Court of Australia in Sydney under the Hague Convention. He also filed a petition pursuant to the Convention in the District Court for the Eastern District of Pennsylvania, alleging that his parental custody rights had been violated by Mrs. Feder's "wrongful removal and/or retention" of Evan and requesting the child's return.

The Third Circuit held that Australia was Evan's habitual residence immediately prior to his retention in the United States by Mrs. Feder. *Feder*, 63 F.3d at 224. In reaching that conclusion, the Circuit noted that while Evan had lived a majority of his

---

**8.** Petitioner filed a custody proceeding in the Israeli Rabbinical Court in Jerusalem. That court determined that it had no jurisdiction, noting that the parties' last place of residence was in the United States where they lived for about seven months, where Maya had attended school, and where Petitioner had started a business. (*See* Trial Ex. D–19.)

That decision was affirmed by the Israeli Supreme Court. While that decision may be interesting, because the determination of the parents' "residence" does not necessarily equate to "habitual residence" of the child, this Court declines to give any weight to the Rabbinical Court's determination.

life in the United States, living in Australia for close to six months immediately preceding his return to the United States was a significant period of time for a four-year old child. *Id.* at 224. It further observed that in Australia,

> Evan attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life. Although Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to that country and live there with one another and their son, and did what parents intent on making a new home for themselves and their child do—they purchased and renovated a house, pursued interests and employment, and arranged for Evan's immediate and long-term schooling. That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work.

*Id.*

### 1. *Parents' Shared Intentions*

█ In this case, Petitioner contends that he and Respondent traveled from Israel to the United States in October 2002 merely for a temporary stay while they attempted to salvage their deteriorating marriage and that they never intended to live in the United States permanently. Petitioner further asserts that it was only upon Respondent's insistence that the family remained in this country for several months, and that Respondent has now refused to return to Israel and wrongfully detained Maya in New Jersey. In contrast, Respondent maintains that she and Petitioner moved to the United States from Israel with an intent to settle here permanently.

In examining the parties' contradictory positions, the Court notes that Respondent was a more credible witness than Petitioner. *See supra* n. 2. Even giving credence to Petitioner's story that he came to this country in an effort to salvage his marriage and that that was a condition imposed by Respondent,[9] which he may have felt reluctant or unenthusiastic about satisfying, Petitioner's actions and his own testimony clearly portray an intent to settle in the United States. *See Mozes v. Mozes,* 239 F.3d 1067, 1075 ("one's actions may belie any declaration that no abandonment was intended.")

For instance, when Petitioner left for Israel in April of 2003, he did not take Maya with him and admittedly lied to his wife by telling her that he would be returning to the United States in a few weeks. It defies common sense to believe that Petitioner would have lied to his wife about his intent to return to the United States if in fact, they had not intended to live in this country.[10]

Additionally, the parties came to the United States with all of their clothing and personal belongings. Moreover, prior to

---

**9.** In *In re Application of Guido Sten Ponath,* 829 F.Supp. 363 (D.Utah 1993), the court held that the mother had not wrongfully removed the child from Germany to Utah. In so holding, the court noted that because the husband had, by means of verbal, emotional and physical abuse, coerced his wife to stay in Germany, he had "removed any element of choice and settled purpose which earlier may have been present in the family's decision to visit Germany." *Id.* at 368. Here, while Peti-

tioner makes conclusory allegations that he was "coerced" by Respondent into visiting the United States and extending their stay here, there is no evidence that Respondent used any verbal, emotional, or physical abuse to remove any element of choice that Petitioner had regarding his intent in coming to the United States in October of 2002.

**10.** Petitioner's admitted lie also undermines his credibility. *See supra,* n. 2.

arriving in the United States, Petitioner had the majority of his wife's paintings sent to the United States, and also sold his house in Moshav Eshtaol, as well as the family's furniture, furnishings and cars. *See* Dr. E.M. Clive, "The Concept of Habitual Residence," 1997 Jurid. Rev. 137, 142 ("A person who has sold house and furniture and set off for a new life in another country would not be using words normally if he or she claimed to be still habitually resident in the old country.") Although initially, Petitioner, in his Order to Show Cause application,[11] claimed that the sale of the house in Israel occurred in February 2002, and not the summer of 2002 as alleged by his wife, Petitioner presented no evidence at trial to support that position. In any event, Petitioner's contention is belied by his unequivocal testimony at the hearing that his family did not move out of the house in Moshav Eshtaol until August of 2002.

Petitioner also provided no evidence to buttress the assertions he initially made in his sworn affidavit that he sold his home simply to pay off mounting debt, rather than in preparation for any move to the United States, and that upon selling his house, he paid his debt from the sales proceeds, and with the remaining funds, eventually bought a house in Tel Aviv, which he owns to date.[12]

Respondent's testimony that she and Petitioner decided to move to the United States to settle here is further supported by the fact that Petitioner incorporated his company, S.E. Technologies, in the United States and established an EIN. While Petitioner admits that he considered the possibility of doing some business in the United States and also consulted with an attorney regarding an L–1 business visa, he emphasizes that he never actually signed the L–1 visa application.[13] However, as testified by Petitioner, he did not tell the Florida attorney to stop the L–1 visa process until April of 2003. *See* Trial Ex. D–20. Therefore, although Petitioner may have changed his mind sometime between October 2002 and April 2003 and formed a unilateral intent to return to Israel due to the unsuccessful efforts to salvage his marriage, that does not bear on the parents' initial shared intent when they left Israel in October 2002. *See In re the Application of Sonja E. Morris,* 55 F.Supp.2d 1156, 1162–63 (D.Colo.1999) (noting that shared intent cannot be altered by the unilateral change in position of one of the parents after arriving at the new state).

While Petitioner admits that immediately prior to coming to the United States in October 2002, he sold a portion of his business machines and equipment, he denies having done so in preparation for any move to the United States. Petitioner insists, rather, that he has always bought, traded, and sold various machinery and tooling required by certain projects or rendered obsolete by the completion of certain projects. However, Petitioner did not tes-

---

**11.** Petitioner's sworn affidavit in support of his Order to Show Cause application contains statements relevant to the Court's determination of the parties' shared intent and Maya's habitual residence. Therefore, notwithstanding that the Court has already ruled on Petitioner's Order to Show Cause application, the Court addresses throughout this Opinion the statements contained in Petitioner's affidavit.

**12.** Respondent testified that Petitioner's mother owned a house in Tel Aviv. According to Respondent, Petitioner convinced his mother to transfer ownership of that house to his name. Respondent did not know whether Petitioner actually purchased that house from his mother.

**13.** Petitioner's contention that his wife and sister-in-law pressured him into filing the L–1 application is, like so many of his other conclusory claims, unsupported by any evidence in the record.

tify or otherwise establish at trial that aside from selling, he actually *bought or traded* any new business equipment immediately prior to his travel to the United States in October 2002. Nor did Petitioner present sufficient evidence to substantiate his conclusory assertion that he did not sever his business ties in Israel. Additionally, while Petitioner may have supplied his Commerce bank account with funds from Israel, there was no evidence to show that, as Petitioner alleges, he continued earning salary from his employment in Israel.

Next, Petitioner claims that he was essentially tricked into signing the one year apartment lease by his wife and her family. Specifically, according to Petitioner, the Sun Valley apartment, owned by a business owned by Respondent's sister's family, was supposed to have been free of charge, but his wife and her sister asked him to sign the lease because having a written lease would be beneficial for Respondent's sister's family's business. Petitioner alleges that he was told that he would not actually have to stay in the apartment for a year.

This argument, however, is undermined by the fact that Petitioner opened a bank account in early October 2002 for the purpose of, among other things, paying rent. Moreover, Respondent, whom the Court found to be more credible than Petitioner, testified that no one ever gave her the impression that she and her husband would not have to pay rent; she also stated that Petitioner never told her that they would be living at Sun Valley for free. Consistent with that testimony, Murray Halpern, Petitioner's brother-in-law, who was the Managing Partner at Sun Valley, stated that he never told Petitioner that he did not have to pay rent. Thus, Petitioner has failed to demonstrate that he was in any way "tricked" into signing the one year apartment lease by his wife and her family.[14]

While Petitioner does not dispute that he opened a savings and checking bank account, he maintains that he always has, and continues to have, his principal bank accounts in Israel. Petitioner also claims that he had bought a cellular telephone on a prior visit to the United States and that both times, he simply cancelled the service upon his return to Israel. To .date, Petitioner purportedly continues to have six operational cell phone lines in Israel, all of which remained operational while he was in the United States. Petitioner further represents that his family's only health insurance plan and doctors all were, and remain in, Israel. Petitioner, however, proffered no evidence to support any of these assertions.

Petitioner explained during his trial testimony that he purchased vehicles instead of renting because he did not have a credit card and because it was cheaper to buy and sell a used car than to rent it. The Court finds that explanation unconvincing. In any event, such conduct certainly does not assist Petitioner in satisfying his burden to show that he had no intent to live in the United States. The Court notes that a tourist intending to visit a foreign country temporarily typically does not buy two cars and home appliances such as a television, and order cable service.

Having paid for a one-year membership at the JCC for his family in January 2003, Petitioner explains that exercise is an integral part of his medically prescribed therapy for his diabetes, and that the annual membership, which was the only type offered by the JCC, was very affordable. The Court, however, questions why, if ex-

---

**14.** It is difficult to believe that a sophisticated businessman who has had dealings with the United States Navy could be so easily "tricked" into unwittingly signing a lease.

ercise is so integral to Petitioner's therapy, he would not have signed up for a membership during the first three months of his stay in the United States.

As for the children, Petitioner alleges in his sworn affidavit that they were enrolled in school because he and Respondent decided that the children's education should not suffer because of their trip, which was taken during the school year. Moreover, he states that he was assured by his wife that it would be possible to enroll the children in school even though they were only visitors, and further, that she forged documents to have the children enrolled. Petitioner also asserts that for the duration of their stay in this country, Maya and her brothers continued to be registered in Israeli schools. Petitioner, however, presented absolutely no evidence at trial to substantiate any of these contentions.

Further, contrary to Petitioner's efforts to highlight his own lack of knowledge and involvement in the children's school enrollment and portray his wife as having controlled that aspect of the children's lives, there was unrefuted trial testimony that Petitioner and Respondent *both* met with the Director of Admissions at Solomon Schechter on multiple occasions to discuss enrolling the children at that school. Petitioner and Respondent then both toured Brooklake Elementary School together before enrolling Maya there. Additionally, in January 2003, it was Petitioner who completed a form listing courses for Adi's expected enrollment in Hanover Park High School in the fall. *See* Trial Ex. D–11.

In an effort to refute the weight of evidence supporting Respondent's position, Petitioner, as proof of a shared intent to return to Israel, points to the fact that he and his family arrived in the United States on round-trip plane tickets that had return dates set for October 21, 2002. The Court, however, does not find that fact to be an accurate indicia of intent. Indeed, Petitioner even acknowledged that they had no intent to go back to Israel on that date and that the return dates are flexible. As an example, Petitioner explained that although his return ticket to Israel after the evidentiary hearing is for July 25, 2004, he could stay in the United States for one year. Moreover, the Court takes judicial notice of the fact that it is cheaper to purchase a round trip ticket than a one way ticket from Israel to the United States on El Al Israeli Airlines.

To show that their trip to the United States was merely intended as a visit, Petitioner, relying on *Mozes*, also points to the fact that they left Israel with B type, non-immigrant tourist visas, which were to expire in April of 2003.[15] In *Mozes*, a factor that the Ninth Circuit considered in examining shared intent was that the parties had left Israel with a temporary visa. However, in so noting, the court stated that unlawful immigration status was highly relevant in circumstances where, as in that case, "the shared intent of the parents is in dispute" such that the district court had properly refrained from finding that the parents had agreed to an indefinite stay in the new forum. *Id.* Here, in contrast, the Court finds that the parents did share the intent to abandon Israel as the habitual residence. Moreover, the fact that Petitioner and Respondent arrived on a B–1 tourist visa is counterbalanced by the fact that Petitioner, even before leaving Israel, hired an attorney to file an L–1 visa on his behalf, and also subsequently

---

**15.** Respondent has since applied for and received an O–1 artist visa, which will expire in 2006. An O–1 visa is given to those who seek to enter the United States and have an "extraordinary ability in the sciences, arts, education, business, or athletics ..." 8 U.S.C. § 1101(a)(O)(I). Respondent intends to apply for permanent residency in the United States.

signed an application for the Immigration Lottery. Thus, the Court concludes that under the circumstances of this case, the type of visa the Sassons traveled with to the United States is not necessarily dispositive of the parents' shared intent regarding Maya's habitual residence.

While Petitioner also argues that a change in Maya's habitual residence "could only have occurred if the Sassons received immigration status permitting them to reside in the United States permanently," Petitioner's Summation at 4, that argument is patently wrong. The Ninth Circuit has clearly stated that, "an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the [Hague] Convention ..." *Mozes,* 239 F.3d at 1082, n. 45 (citing Dr. Clive, "The Concept of Habitual Residence," 1997 Jurid. Rev. at 147).

Additionally, Petitioner declares that it is evident from "look[ing] to the future" how unsettled the question of Maya's habitual residence, *see* Petitioner's Summation at 8; more specifically, Petitioner contends that because it is uncertain where Respondent will live in 2006 after her O-1 artist visa expires, there could not have been a shared intent to change Maya's habitual residence. However, it is clear that "[t]o determine the habitual residence, the court must ... examine past experience, not future intentions." *Friedrich,* 983 F.2d at 1401 (finding that mother's intent to return to the United States with her child in the future when she was discharged from the military was irrelevant to court's inquiry into habitual residence of child).

Thus, based on Petitioner's own testimony and conduct prior to and upon arrival in the United States, the Court finds that at the time the parties left Israel for the United States in October of 2002, they had a shared intent to settle in the United States.

Finally, even if, as Petitioner maintains, he and Respondent only intended to live in the United States for a "prolonged" but limited period of time while trying to resolve their marital problems, rather than permanently, that intent is still sufficient to establish a new habitual residence. *See Feder,* 63 F.3d at 224 ("That Mrs. Feder did not intend to remain in Australia *permanently* and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work." (emphasis added)); *Mozes,* 239 F.3d at 1074 (noting that habitual residence does not mean a place "where you plan to leave your bones"). As explained in *In re Bates,* No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989):

> All the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely; *indeed his purpose, while settled, may be for a limited period.* Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode. And there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Feder,* 63 F.3d at 223 (emphasis added); *Toren v. Toren,* 26 F.Supp.2d 240, 243 (D.Mass.1998) (holding that habitual residence was United States regardless of fact that parents had agreed that children would return to Israel on a date certain and that United States was not intended to be the children's permanent residence), *vacated on other grounds,* 191 F.3d 23 (1st Cir.1999).

### 2. *Maya's Circumstances in the United States*

When Petitioner, in June of 2003, filed with the U.S. Central Authority a Request Pursuant to the Hague Convention seeking the return of his daughter, Maya had already been residing in the United States for eight months and had nearly completed the entire first grade in the United States. By the time Petitioner filed the present petition before this Court, Maya had been living in this country for almost a year. By now, Maya has finished second grade and been residing in the United States for approximately twenty-two months, an amount of time that the Court finds is sufficient for acclimatization and a "degree of settled purpose" from the child's perspective. *See Feder,* 63 F.3d at 224 (finding that while child had lived a majority of his life in the United States, living in Australia for close to six months was a sufficient period of time to find Australia to be new habitual residence); *In re Philip Edward Robinson,* 983 F.Supp. 1339 (D.Colo. 1997) (finding that after living in Colorado for 22 months, children were "settled" in that environment); Carol S. Bruch, "Temporary or Contingent Changes in Location Under the Hague Child Abduction Convention," (2000) (noting that stays of a year or longer almost invariably produce findings of a new habitual residence); Dr. Clive, "The Concept of Habitual Residence," 1997 Jurid. Rev. at 141 (noting no discovery of any cases "where a person has been found not to be habitually resident in a country where he or she has lived for a year or more.")

Indeed, various witnesses testified that Maya is essentially well adjusted to life here in this country. Such testimony on this issue was not refuted by Petitioner with any evidence to the contrary. Maya attends school here, participates in various activities outside of school (i.e. swimming, karate), speaks English, has English speaking friends, and maintains a close relationship with her extended family residing in New Jersey. Lastly, while Maya has many relatives currently residing in Israel, *see* Trial Ex. P–24, she also has many friends and relatives in the United States. *See* Trial Ex. D–25.

Petitioner, however, argues that should this Court find that in October 2002, he intended to permanently reside in the United States, he abandoned that intent by November 2002. Therefore, he erroneously concludes that this Court should only look at Maya's acclimatization between October 2002 and November 2002. To do otherwise, he contends, would be ignoring shared parental intent and rewarding Respondent for kidnaping. However, as discussed above, the parents in this case formed a shared intent to settle in the United States, if even for a limited duration. That shared intent cannot then be unilaterally altered by a change in position of one of the parents after arriving at the new habitual residence. *See Mozes,* 239 F.3d at 1078 n. 29 ("'If ... there is a genuine difference [of parental intention] then the conclusion must be that there is no settled purpose or intention.'" (citation omitted)); *In re the Application of Sonja E. Morris,* 55 F.Supp.2d at 1162–63. Because Respondent never agreed to return to Israel once they arrived in the United States with the intent to settle here, there was no subsequent "shared" intent by the parents to return to Israel that Petitioner can accuse this Court of ignoring, nor has there been any wrongful retention or kidnaping.

Based on the testimony at the evidentiary hearing and the applicable law, the Court concludes that Petitioner has failed to meet his burden of establishing, by a preponderance of the evidence, that Israel is Maya's habitual residence. Rather, Maya was habitually resident in the Unit-

ed States immediately prior to her retention by Respondent in the United States. Maya's habitual residence shifted from Israel to the United States in October 2002 when the parents arrived in this country with the shared intent to settle here, if even for a limited time. Thus, Respondent's retention of Maya in the United States was not wrongful under the Hague Convention.

## III. CONCLUSION

For the foregoing reasons, Petitioner Ezra Sasson's Petition for the Return of the Child is denied.[16]

An appropriate Order follows.

### ORDER

This matter having come before the Court on the Verified Complaint of Petitioner; and

The Court having considered the submissions of the parties; and

The Court having held an evidentiary hearing on July 20, 21, 22, 2004; and

For the reasons set forth in the Court's Opinion issued this day; and

For good cause shown;

IT IS on this 30th day of July, 2004, hereby ORDERED that Maya Sasson's "habitual residence" pursuant to the terms of the Hague Convention is the United States of America; and

IT IS FURTHER ORDERED that Petitioner Verified Complaint is **dismissed**; and

IT IS FURTHER ORDERED that the Clerk of the Court shall close this case.

---

16. As the Court stated at the hearing, this Court's ruling that Respondent's retention of the child is not wrongful under the Hague Convention merely determines that a court in the United States, instead of Israel, will make the ultimate decision with regard to custody. This Court's decision has no bearing on the ultimate issue of custody. *See Friedrich,* 983 F.2d at 1400.