**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BLANCA ELISA REYES VALENZUELA, *Petitioner-Appellant*, <br><br> v. <br><br> STEVE LOUIS MICHEL, *Respondent-Appellee*. | No. 12-17205 <br><br> D.C. No. 4:12-cv-00215-RCC <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
August 14, 2013—San Francisco, California

Filed November 15, 2013

Before: Stephen Reinhardt, John T. Noonan,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Reinhardt

## SUMMARY[*]

### Hague Convention

The panel affirmed the district court's denial, after a bench trial, of a mother's petition under the Hague Convention on the Civil Aspects of International Child Abduction for the return of her children to Mexico.

The children were born in Mexico. Their parents had used a "shuttle custody" arrangement in which the children had split their time between Mexico and the United States. The panel held that the Convention did not attach because the parents shared a settled intention to abandon Mexico and adopt the United States as the children's habitual residence.

The panel concluded that the father also could have prevailed on the basis that he and the mother shared a settled intention to abandon Mexico as the children's *sole* habitual residence, that there was an actual change in geography, and that an appreciable period of time had passed; therefore, the children were habitually resident in the United States when the father retained them.

Judge Reinhardt concurred in his colleagues' conclusions. He wrote that the questions of "shuttle custody" and "dual habitual residence" were deserving of more thorough consideration than was possible in this case.

The panel ordered the mandate to issue at once.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Ann Haralambie, Tucson, Arizona, for Petitioner-Appellant.

Scott Gan, Tucson, Arizona, for Respondent-Appellee.

**OPINION**

NOONAN, Circuit Judge:

We are tasked with deciding whether twin girls, now resident with their father in the United States, should be returned to their mother in Mexico. The U.S. District Court for District of Arizona ruled that they should not. We affirm.

FACTS

In late 2006, Steve Michel and Blanca Reyes Valenzuela chose to live together in Nogales, Mexico. The twins were born in 2008.

According to Steve's undisputed testimony, the couple lived together in Nogales, Mexico. The couple agreed in 2009 that to avoid having to cross the border for work, Steve should move to the Arizona side. They agreed to "set a pattern to keep [the twins] in the United States" in order to take advantage of education, medical help and government support in the United States.

After the twins received their passports in May 2009, until the fall of 2010, they split their time between Mexico and the United States. They lived with Blanca in Mexico Monday

through Wednesday and lived with Steve in the United States Thursday through Sunday.

In September 2010, the relationship between Blanca and Steve soured.  Blanca threatened to have him beaten up or killed. For around two months in the fall of 2010, Blanca did not allow him to have any contact with the twins.  Under the belief that she posed a danger to the children, Steve reported Blanca to Arizona Child Protective Services and to its Mexican equivalent, DIF, in November 2010.

From Christmas 2010 to February 2011, the twins split their time between Steve and Blanca evenly. In February 2011, Blanca would not regularly meet Steve or respond to his messages to go to the border so he could take the twins to the United States.  Steve did take the children on March 24, 2011.  He told Blanca he would return them at 7 PM on March 27th, but he sent Blanca a text message on March 27th saying he would not bring them back.

## PROCEEDINGS

Blanca filed her application under the Hague Convention on International Aspects of Child Abduction, 19 I.L.M 1501 (entered into force October 25, 1980) ["Convention"], two days after Steve retained the twins; she also filed a petition for Writ of Habeas Corpus for Return of Child in the District Court claiming Steve violated the Convention and its implementing legislation, 42 U.S.C. §11063(a), the International Child Abduction Remedies Act ["ICARA"].

At trial, Blanca and her witnesses testified via telephone from Mexico with the help of an interpreter.  Steve testified that Blanca agreed to keep the twins in the United States to

send them to school and get them better medical care. Blanca, in her testimony, disagreed with much of what Steve had said during his testimony. She also talked over some of her witnesses. The district court found Steve's testimony to be more credible, noting that Blanca seemed to be coaching her witnesses. Based on Steve's testimony and the testimony of Fernando Leal, the DIF social worker, the district court held that the parties "abandoned Mexico as [the children's] habitual state of residence when their parents decided they should, for an indefinite period, spend the majority of their time in the United States."

The district court denied Blanca's motion for reconsideration, holding that (1) substantial evidence supported the judgment; and (2) Steve's testimony was more credible on the issue of habitual residence, despite Leal's affidavit withdrawing a portion of his trial testimony.

Blanca timely appeals.

## ANALYSIS

Both the United States and Mexico are parties to the Convention. The central purpose of the Convention is to prevent forum shopping in custody battles. PAUL R. BEAUMONT & PETER E. MCELEAVY, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION, 1 (1999). It explicitly is not aimed at adjudicating the underlying custody dispute. Convention, Art. 19. "The Convention's focus is . . . whether a child should be returned to a country for custody proceedings and not what the outcome of those proceedings should be." *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004). The drafters intended that the Convention be interpreted uniformly across

jurisdictions in order to avoid forum shopping. The Senate, in adopting the Convention into law, reaffirmed that goal. Elisa Perez-Vera, Explanatory Report ¶ 66, *in* 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) ["Perez-Vera Report"]; ICARA § 11601(b)(3)(B).

Under Article 3 of the Convention,

> The removal or the retention of a child is to be considered wrongful where –
>
> a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The official report for the Convention describes "habitual residence" as "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile." Perez-Vera Report ¶ 66. We, however, have rejected a purely factual approach to habitual residence for reasons laid out by Chief Judge Kozinski in *Mozes v. Mozes*, 239 F.3d 1067, 1071–73 (9th Cir. 2001) ("'Habitual residence' is the central – often outcome-determinative – concept on which the entire system is founded. Without intelligibility and consistency in its

application, parents are deprived of crucial information they need to make decisions, and children are more likely to suffer the harms the Convention seeks to prevent."). Along with other circuits, we approach the question of habitual residence as a mixed question of law and fact. *See In re B. Del C.S.B*, 559 F.3d 999, 1008 (9th Cir. 2009); *Silverman v. Silverman*, 338 F.3d 886, 896 (8th Cir. 2003); *Feder v. Evans-Feder*, 63 F.3d 217, 222 n. 9 (3d Cir. 1995). We "review 'essentially factual' questions for clear error and the ultimate issue of habitual residence de novo." *In re B. Del C.S.B*, 559 F.3d at 1008 (quoting *Holder*, 392 F.3d at 1015).

It is undisputed that Blanca was exercising her rights of custody at the time of retention. The question is whether the children were habitually resident in Mexico, the United States, or both, at the time of their retention.

*Factual determinations*

"Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52. Where, as here, findings of fact turn on credibility determinations, the findings receive heightened deference in light of "the fact finder's unique opportunity to observe the demeanor of the witnesses." *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 671 (9th Cir.1990) (citation omitted). A finding of clear error requires a "definite and firm conviction that a mistake has been committed." *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 792 (9th Cir. 2001).

The district court based its findings of fact primarily on three key credibility determinations. First, it found that Steve's version of the facts was credible. Second, it found that Blanca's account was not consistent with her earlier statement to the social worker about how long the twins were living in the United States. Finally, it found that Blanca's witnesses either lacked independent foundation for their testimony or were being audibly coached while they were testifying, possibly by Blanca herself. The court therefore adopted Steve's testimony in its findings of fact with occasional reliance on the social worker's testimony. These credibility determinations are supported by the record and were not clear error. *See United States v. Lang*, 149 F.3d 1044, 1046 (9th Cir. 1998) (reviewing credibility determinations under a clear error standard).

In particular, Steve's testimony as to the frequency with which he had the children was supported by the testimony of another of his daughters. His testimony about the duration of the shuttle custody arrangement was supported by this daughter as well as by Blanca's testimony. Steve's testimony about the timing and nature of his complaint to the Mexican DIF was supported by the DIF social worker.

Blanca undermined her own credibility. In at least two places in the transcript Blanca seems to be participating while Lupita, her sister-in-law, testified. We find no clear error in the district court's findings of fact.

*Legal Determinations*

Despite the drafters' insistence that "habitual residence" does not need defining, courts have inevitably tried. The resulting lack of uniformity across jurisdictions is

unsurprising, especially in light of the variety of situations in which a dispute over habitual residence can arise. In the Ninth Circuit, we look for the last shared, settled intent of the parents in an attempt to determine which country is the "locus of the children's family and social development." *Mozes*, 239 F.3d at 1084. *Mozes* requires that there be a shared intent to abandon the prior habitual residence, unless the child "consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each." *Id.* at 1081 and n.17. Once intent is shown, *Mozes* requires an "actual change in geography" combined with an "appreciable period of time" to establish a change in habitual residence. *Id*. at 1078 (citing *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) for the former factor and *C v S (minor: abduction: illegitimate child)*, [1990] 2 All E.R. 961, 965 (Eng.H.L.) for the latter).

Following *Mozes*, the district court ruled that Steve and Blanca had a shared, settled intent to abandon Mexico and adopt the United States as the twins' habitual residence, and therefore the Convention does not attach. We agree that the Convention does not attach. Along with our affirmance of the district court's decision, we offer an alternate route to the same outcome, which reflects our efforts to further the Senate's goal of uniform interpretation of the Convention.

Most habitual residence cases fit one of the following two patterns:

    I.   Parent 1 and Parent 2 decide to move with their children from Country A to Country B. After some time in Country B, Parent 1 decides that she does not want to live in Country B and moves with the children

back to Country A. Parent 2 petitions for return of the children, arguing that the children had acquired habitual residence in Country B.

II. Parent 1 and Parent 2 live in Country A. They decide together that Parent 2 and the children will visit Country B for a predetermined amount of time, returning to Country A after the visit. After arriving in Country B, Parent 2 decides to extend his time there indefinitely and to keep the children with him. Parent 1 petitions for return of the children, arguing that they had not acquired habitual residence in Country B.

Very few cases arising under the Convention feature shuttle custody. In shuttle custody situations, Parent 1 and Parent 2 agree to split custody between two countries, shuttling the children between the countries on a regular basis. Steve and Blanca decided the children would split time between countries before their relationship soured, and the children were shuttled more frequently than in any other cases. Blanca's and Steve's residences, as of the time of the petition, are in two different countries, but they are only around ten miles apart, by far the closest of any two parents in all of the habitual residence cases brought under the treaty worldwide.

The only U.S. court to entertain the possibility that a child had alternating habitual residences was a district court in New York. In *Brooke v. Willis*, a court-ordered custody arrangement dictated that a child spend fifty percent of her

time in the United States and the other fifty percent in England. 907 F. Supp. 57 (S.D.N.Y. 1995). After a fall semester in California, the mother retained the child in California in breach of the agreement. The father, in England, filed a petition under the Convention. The court ruled that the child was habitually resident in England at the time of her retention, with the caveat that "it is arguable that [the child] is also a habitual resident of the United States under the Convention. However, for purposes of this petition it is only crucial to determine if England can be considered [her] habitual residence." *Id*. at 61 n.2. No other U.S. court has been faced with shuttle custody under the Convention.

The closest fact pattern to the one before us is from a case decided by the High Court of Northern Ireland. In *In re C.L. (a minor)*, a child shuttled between Belfast and Dublin, a distance of 105 miles. After acknowledging that the fact pattern is "unusual if not unique," the court found that when the child moved between his parents "on a weekly basis, he was habitually resident in whichever jurisdiction he was living in." In particular, the judge said that

> [t]he decision to share the responsibility for the upbringing of the child on an alternate week basis in the jurisdictions was a major step in the child's life. It is also significant that the week in Dublin was spent in a home which was the habitual residence of his carers for that week and with whom he was familiar. It was not intended that his stay there on an alternate week basis would be either "merely transient or temporary". *Thus residence solely in Northern Ireland was broken and the respondent agreed to that*. The continuance of

this new arrangement must inevitably lead to the child having that degree of continuity in the other jurisdiction, which is required for habitual residence in that jurisdiction when he is residing there. *Thus by January 1998 the child was habitually resident in whichever jurisdiction he was living for a particular week. . . . Should he remain longer than a week in one jurisdiction his habitual residence would not change so long as he remains there*.

*In re C.L. (a minor) and In re the Child Abduction and Custody Act 1985; JS v CL* (unreported NIFam HIGJ2630 25 Aug. 1998) (emphasis added).

Like the *In re C.L.* court in Northern Ireland, courts in other jurisdictions have held that the shuttle custody cases before them reflect serial, or alternating, habitual residence. In *Wilson v. Huntley*, a Canadian case, a three-year-old girl split time between her parents, who lived in Germany (mother) and Canada (father). The splits varied in length, from three to six months. A few weeks before she was to return from Canada to Europe, the father informed the mother that he wanted to keep his daughter in Canada. The court found that a person, including a child, could have consecutive, alternative habitual residences in two different States at separate times. The court held that at the time of retention, the girl was habitually resident in Canada. *Wilson v. Huntley*, 2005 CarswellOnt 1606 (WL), (Can. O.N. S.C.) ¶ 28 ("It is of course not in doubt that a person, including a child, may have a habitual residence in two different countries at different times of the year.") (quoting *In the Matter of A. (Abduction: Habitual Residence)*, [1998] 1 F.L.R. 497 (Eng.), *available at* http://www.hcch.net/

incadat/fullcase/0176.htm) (internal citation omitted).  *See also Watson v. Jamieson*, (1998) S.L.T. 180, 182 (Scot.) ("Where residence with two parents is divided equally it is unreal, in the absence of other differentiating factors, to see residence with one parent as primary and the stays with the other parent as interruptions.").

The district court judge below did not err in deciding that Blanca and Steve shared a settled intention to abandon Mexico – they had immediate plans to avail the twins of government assistance in the United States as well as longer-term plans to educate the children in the United States.  We note that, based on the shuttle custody cases from our sister courts presented above, Steve could have prevailed by showing that he and Blanca shared a settled intention to abandon Mexico as the twins' *sole* habitual residence, that there was an actual change in geography, and that an appreciable period of time had passed.  Because all three elements are present here, we affirm the district court in its decision that the twins were habitually resident in the United States when Steve retained them.

While the emotional aspects of this case are fraught, the law is clear.  The children were habitually resident in the United States when Steve retained them.  Their retention was therefore not "wrongful" under the Convention. Steve is not required by the Convention or this court to return the children to Mexico.

**AFFIRMED.**

The mandate shall issue at once.  Fed.R.App.P. 2.

REINHARDT, Circuit Judge, Concurring:

As Judge Noonan reports, this case presents a unique fact pattern. Given the district court's findings, I concur in my colleagues' conclusions. I also believe, however, that the questions of "shuttle custody" and "dual habitual residence" are deserving of more thorough consideration than is possible in the case before us. Still, Judge Noonan has done us a service by beginning that exploration here.