**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELAINE MARY MURPHY,
*Plaintiff-Appellant*,

v.

WILLIAM MILLIGAN SLOAN,
*Defendant-Appellee*.

No. 13-17339

D.C. No.
3:13-cv-04069-JST

OPINION

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted
August 13, 2014—San Francisco, California

Filed August 25, 2014

Before: Alex Kozinski, Chief Judge, and M. Margaret
McKeown and Richard R. Clifton, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Hague Convention

The panel affirmed the district court's judgment in an action under the Hague Convention on the Civil Aspects of International Child Abduction, seeking the return of a child to Ireland.

The panel affirmed the district court's finding that the child was a habitual resident of the United States, where she resides with her father.  Declining to adopt a habitual residence standard that would focus on the subjective experiences of the child, the panel held that the proper standard, also adopted by other circuits, takes into account the shared, settled intent of the parents and then asks whether there has been sufficient acclimatization of the child to trump this intent.  The panel concluded that this standard was not incompatible with international consensus.  The panel affirmed the district court's finding that the child's move to Ireland was intended as a trial period, and there was no settled mutual intent to abandon her prior habitual residence in the United States.  In addition, any acclimatization of the child to Ireland did not overcome the absence of a shared settled intention by the parents.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Thomas W. Wolfrum (argued), Walnut Creek, California; Jeremy D. Morley, New York, New York, for Plaintiff-Appellant.

William M. Sloan (argued), Mill Valley, California, In Pro Per.

**OPINION**

McKEOWN, Circuit Judge:

In this case we consider the significance of a "trial period" of residence on a child's "habitual residence" under the Hague Convention on the Civil Aspects of International Child Abduction.[1] Elaine Murphy seeks the return of her child, E.S., to Ireland. We affirm the judgment of the district court that E.S. was a habitual resident of the United States, where she presently resides with her father, William Sloan.

**Background[2]**

Sloan, a citizen of the United States, and Murphy, a citizen of Ireland, were married in California in 2000. They lived together in Mill Valley, in California, and had a

---

[1] Oct. 25, 1980, 19 I.L.M. 1501, as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* (hereinafter "the Hague Convention" or "the Convention").

[2] This background summary is based on the district court's factual findings.

daughter, E.S., in 2005. In October 2009, Sloan told Murphy that he felt their marriage was at an end, and moved to a different bedroom in their house.

In January 2010, Murphy and Sloan enrolled E.S. in a private California preschool for the next fall. But these plans changed in the spring of 2010, after Murphy proposed moving to Ireland so that she could get a master's degree in fine arts from University College Cork and so that E.S. "could experience going to school" there. Murphy and Sloan discussed the move to Ireland as a "trial period," and Sloan wrote to both the private preschool and the public school district to inform them of E.S.'s move and the temporary nature of the plan. ("This was very last minute, but we decided to try living in Ireland for a year[.]").

In early 2010, Sloan had purchased a second home in Mill Valley so that E.S. could live easily with both parents. Sloan and Murphy agreed to store Murphy's belongings there during Murphy's time in Ireland, and to rent, rather than sell, this home during her absence so that she would have a place to live when she returned. Murphy moved with E.S. to Ireland in August, and Sloan paid the rent on that home as well. Sloan filed for divorce in October 2010, and served Murphy shortly thereafter.

Over the next three years, E.S. attended school in Ireland, but returned to the United States each February, April, summer, Halloween and Thanksgiving to spend time with her father and his extended family. Sloan visited Ireland each December to spend Christmas with E.S. and Murphy. Throughout E.S.'s time in Ireland, she continued to receive her medical and dental care in California rather than in Ireland.

In the spring of 2013, Murphy applied to graduate school in England. Over the previous two years, she had expressed interest in applying to schools in New Haven, New York, Providence and, as recently as October 2012, in California.

In April 2013, without Sloan's knowledge or consent, Murphy took E.S. out of school before the term had ended to visit her boyfriend in the Maldives.[3] She did not respond to Sloan's inquiries for five days. On May 1, Sloan wrote to Murphy asking when E.S. would return to Ireland to resume school, and stated, "If you do not tell me when you are going to get back to Ireland, I am going to start looking into getting her into school here in California for the remainder of the year, and I will come pick her up if I have to." Sloan wrote to Murphy twice the following day, still attempting to find out when she planned to return to Ireland and sending her links to furnished rental units near E.S.'s school. Murphy's only response was to ask Sloan to review the draft of a paper she had written for graduate school. She did not return with E.S. to Ireland until May 7, 2013, by which time E.S. had missed nineteen days of school.

Sloan arrived in Ireland on June 12, 2013, planning to celebrate E.S.'s birthday on June 13, depart on June 16, and return to Ireland on June 26 to bring E.S. back to California for the summer. On the day of Sloan's arrival, Murphy informed him that her landlord had terminated her lease, and that she was planning to leave again for Asia with E.S.

---

[3] Murphy has a boyfriend named Ahmed Abbas. The two became friends at some point in 2009, and their relationship later developed into a romantic one before Murphy moved to Ireland in 2010. Abbas, a businessman, lives in Sri Lanka and spends considerable time in the Maldives and provides Murphy with financial support.

Sloan, concerned about E.S.'s absences from school, objected strenuously and begged Murphy to allow E.S. to finish her last two weeks of school in Ireland, offering to pay for a hotel. When Murphy refused to consider this option, and because Sloan's work commitments prevented him from remaining in Ireland until E.S.'s semester was complete two weeks later, Sloan took E.S. with him to the United States when he left Ireland on June 16. Murphy did not object, and told Sloan she was applying to graduate programs in England and the United States. The next day, Murphy flew to the Maldives, and spent much of the summer there and in Sri Lanka with her boyfriend.

Murphy and Sloan agree that on June 21, 2013, Sloan told Murphy that he did not intend to return E.S. to Ireland, to which Murphy responded that if E.S. was going to live in the United States, Murphy would move next to him in Mill Valley. Murphy took no action to compel E.S.'s return to Ireland for nearly three months, until September 2013, when she filed the action that led to the present appeal.

E.S. began third grade in Mill Valley in August 2013. In October 2013, the Marin County Superior Court entered a judgment dissolving the marriage, but left pending the state court action for purposes of issuing further orders regarding child custody, child support and spousal support.

Murphy brought suit under the Hague Convention to compel E.S.'s return to Ireland, contending that Ireland was E.S.'s "habitual residence." The district court denied Murphy's petition after considering Murphy and Sloan's sworn declarations, testimony and documents presented at an evidentiary hearing and depositions of Murphy's boyfriend and an expert witness. It determined with a "high degree of

conviction" that "Murphy and Sloan never had the shared, settled intent to shift E.S.'s habitual residence from the United States to Ireland," and found that the spring of 2010 was the last time that Sloan and Murphy had a shared, settled intent, which was that E.S. reside in California. The court concluded that "E.S. was, at the time of the alleged wrongful retention, and now remains, a habitual resident of the United States."

## DISCUSSION

### I. The Hague Convention Framework for Habitual Residence

The Hague Convention, which was drafted in response to concerns about "unilateral removal or retention of children by parents, guardians or close family members," seeks to prevent forum shopping in custody battles. *Mozes v. Mozes*, 239 F.3d 1067, 1070–72 (9th Cir. 2001) (internal quotation marks omitted). Under Article 3 of the Convention,

> The removal or the retention of a child is to be considered wrongful where—
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was *habitually resident* immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or

alone, or would have been so exercised but for
the removal or retention.

Convention, art. 3, 19 I.L.M. at 1501 (emphasis added).
"[W]hen a child who was habitually residing in one signatory
state is wrongfully removed to, or retained in, another, Article
12 provides that the latter state 'shall order the return of the
child forthwith.'" *Mozes*, 239 F.3d at 1070 (quoting
Convention, art. 12, 19 I.L.M. at 1502). The United States
and Ireland are both signatories to the Convention.

Determination of "habitual residence" is "perhaps the
most important inquiry under the Convention." *Asvesta v.
Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009). In giving
practical application to this term, we are bound by the
language of the Convention, along with our decision in
*Mozes*, which sets forth the governing framework.

To determine a child's habitual residence, we "look for
the last shared, settled intent of the parents." *Valenzuela v.
Michel*, 736 F.3d 1173, 1177 (9th Cir. 2013). Where a child
has a "well-established habitual residence, simple consent to
[her] presence in another forum is not usually enough to
shift" the habitual residence to the new forum. *Mozes*,
239 F.3d at 1081. "Rather, the agreement between the parents
and the circumstances surrounding it must enable the court to
infer a shared intent to abandon the previous habitual
residence, such as when there is effective agreement on a stay
of indefinite duration." *Id.*

The parents' intent is not the only factor to consider. As
we explained in *Mozes*, the question is "whether we can say
with confidence that the child's relative attachments to the
two countries have changed to the point where requiring

return to the original forum would now be tantamount to taking the child out of the family and social life in which its life has developed." *Id.* (internal quotation marks omitted).

Murphy urges us to adopt a habitual residence standard that would focus on the subjective experiences of the child, contending that *Mozes* is out of step with our sister circuits and international consensus. We decline to accept Murphy's formulation. For one, nearly every circuit has adopted our view of the proper standard for habitual residence, which takes into account the shared, settled intent of the parents and then asks whether there has been sufficient acclimatization of the child to trump this intent. *Id.* at 1076–79; *see, e.g.*, *Darín v. Olivero-Huffman*, 746 F.3d 1, 11 (1st Cir. 2014); *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006); *Maxwell v. Maxwell*, 588 F.3d 245, 253–54 (4th Cir. 2009); *Larbie v. Larbie*, 690 F.3d 295, 310–11 (5th Cir. 2012); *Koch v. Koch*, 450 F.3d 703, 717–18 (7th Cir. 2006); *Ruiz v. Tenorio*, 392 F.3d 1247, 1252–54 (11th Cir. 2004) (per curiam). *But see Robert v. Tesson*, 507 F.3d 981, 991 (6th Cir. 2007) (focusing "solely on the past experiences of the child, not the intentions of the parents").

For another, we do not view *Mozes* as incompatible with international consensus. Murphy argues that in foreign courts, parental intent is "only one of the factors that may be relevant" to the habitual residence inquiry. She points to decisions of courts in Australia, Canada, the European Union, Ireland, New Zealand and the United Kingdom, contending that some of these countries place a greater emphasis on a child's surroundings or "actual centre of interests" in determining habitual residence than we do. Although the language of the Convention is universal, we recognize that

courts around the world may have somewhat varied approaches to balancing the factors relevant to the determination of a child's habitual residence, including parental intent and the child's circumstances. But even counsel for Murphy acknowledges that courts in Britain, the European Union and New Zealand, among others, look to many factors in determining a child's habitual residence, including parental intent. In this regard, our decision in *Mozes*—by which we are bound—is not inconsistent with recent decisions of international courts.[4] We are not persuaded that there has been a worldwide sea change since *Mozes*—let alone a new worldwide consensus—that would warrant a suggestion to reconsider our decision. Nor, of course, are we free to ignore binding circuit precedent.

## II. Shared, Settled Intent

Because the issue of "settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court," *Mozes*, 239 F.3d at 1075–76, we begin with the court's findings.[5] In conducting our review, we give

---

[4] We note, for example, that although counsel for Murphy emphasizes a recent change in British law, post-dating *Mozes*, even the newest British cases emphasize that parental intent plays a role in determining a child's habitual residence, alongside other considerations. *See, e.g.*, *In re KL* [2013] UKSC 75 at ¶ 23 (noting that "it is clear that parental intent does play a part in establishing or changing the habitual residence of a child").

[5] Although the official report of the Convention describes habitual residence as a "question of pure fact," "this has not been understood to mean that [the determination] is left entirely within the unreviewed discretion of the trial court." *Mozes*, 239 F.3d at 1071, 1073. Instead, we review "essentially factual questions for clear error and the ultimate issue of habitual residence de novo." *Valenzuela*, 736 F.3d at 1176 (internal quotation marks omitted).

"appropriate deference to the district court's findings of fact and credibility determinations." *Papakosmas v. Papakosmas*, 483 F.3d 617, 623 (9th Cir. 2007).

It is undisputed that before she left for Ireland, E.S.'s habitual residence was the United States. In concluding that "the parties never had a 'shared settled intent' that E.S.'s habitual residence would be Ireland," and that "E.S. never abandoned her habitual residence in the United States," the district court made a number of factual findings. These include the finding that the last "shared, settled intent regarding E.S.'s habitual residence" was in the spring of 2010 (United States); that "Murphy's move to Ireland with E.S. was intended as a 'trial period,' and that E.S. never abandoned her habitual residence in the United States"; that E.S. retains strong ties to community and family in California and elsewhere in the United States; that Murphy had no fixed residence in Ireland as of the date of the wrongful retention; that many of Murphy's and E.S.'s possessions remained in California; and that E.S. was continuing to spend part of the year in California with Sloan. The district court further noted that E.S. retained both U.S. and Irish citizenship; that Murphy has a California driver's license, but not an Irish one; and that Murphy had no permanent home or longer-term lease or means of support in Ireland, and no longer had any attachment to Ireland in terms of work or schooling after she completed her master's degree in October 2013.

To be sure, in cases in which parents "have shared a settled mutual intent that [a] stay [abroad] last indefinitely," "we can reasonably infer a mutual abandonment of the child's

prior habitual residence." *Mozes*, 239 F.3d at 1077.**⁶** But this is not such a case. Rather, this case falls in the alternative category identified in *Mozes*: one in which the "circumstances are such that, even though the exact length of the [child's] stay was left open to negotiation, the court is able to find no settled mutual intent from which abandonment can be inferred." *Id.*; *see id.* at 1077–78 (noting that "[c]learly, this is one of those questions of 'historical and narrative facts' in which the findings of the district court are entitled to great deference"). Indeed, there was never any discussion, let alone agreement, that the stay abroad would be indefinite. As the district court expressly found, the move to Ireland was "intended as a 'trial period,'" not as a permanent relocation.

The facts do not evince a shared, settled intent to abandon the United States as E.S.'s residence. Instead, they point to the opposite conclusion. Sloan never intended that the stay in Ireland be anything but a "trial period." Murphy, moreover, did not have a settled intent to remain in Ireland, either alone or with E.S., as in the last two years she had applied or had considered applying to graduate schools outside of Ireland, including in the United States, and had not enrolled E.S. in

---

**⁶** *Mozes* notes that where a parent who "agrees to . . . an arrangement without any clear limitations" whereby a "child goes to live with a parent in that parent's native land," the parent "may well be held to have accepted th[e] eventuality" that the child "will soon begin to lose its habitual ties to any prior residence." 239 F.3d at 1082. The scenario in *Mozes*, however, describes a situation in which the parents agree to an arrangement "on an open-ended basis," or have a "settled intent in favor of indefinite residence." *Id.* As noted above, the present case falls into a different category: arrangements whose exact length are left open but where there is no settled intent. Notably, Sloan never "accepted th[e] eventuality" that E.S. would lose her ties to him or to his country. *See id.*

school in Ireland for the fall of 2013.[7] When Sloan took E.S. back to California and told Murphy that E.S. would be enrolling in school in Mill Valley, Murphy did not object, and instead stated "th[at] she was applying to graduate programs." Murphy told Sloan on June 21, 2013 that if E.S. was moving back to the United States, she would move next to him in Mill Valley.[8]

The district court's factual findings are not clearly erroneous, nor do we disagree with its conclusion that E.S. never abandoned her habitual residence in the United States.

## III.    Acclimatization

Shared parental intent is not always dispositive. Certain circumstances related to a child's residence and socialization in another country—a process called "acclimatization"—may change the calculus. To infer abandonment of a habitual residence by acclimatization, the "objective facts [must] point

---

[7] We cite the uncertainty of Murphy's plans—which included the possibility of returning to the United States—not to penalize her for weighing her options, but as evidence that there was no settled intent on her part, let alone an intent shared with Sloan, to change E.S.'s habitual residence.

[8] Murphy argues that Sloan's proposed draft marital settlement proves that Sloan had conceded that E.S.'s habitual residence would be Ireland. To begin, the specifics of the settlement *proposals* can hardly be characterized as evidence of anything. The initial draft of the proposal, noting that E.S. would spend part of her time in Ireland, was replaced by a subsequent draft that omitted the country of Murphy's future residence. At best, the draft documents speak to possible future residence, not the last shared, settled intent of the parents. These documents simply show that the parties were continuing to use courts in California to arrange their affairs, including child custody.

*unequivocally* to [the child's] ordinary or habitual residence being in [the new country].ʺ**⁹** *Mozes*, 239 F.3d at 1081 (emphasis added) (internal quotation marks omitted).

We have cautioned that "courts should be slow to infer from . . . contacts [with the new country] that an earlier habitual residence has been abandoned," *id.* at 1079, both because the inquiry is fraught with difficulty,**¹⁰** and because readily inferring abandonment would circumvent the purposes of the Convention.

Determinations regarding acclimatization are highly fact-bound, and there is no bright line as to the temporal limits for such adjustment. Nor should "acclimatization . . . be confused with acculturation." *Papakosmas*, 483 F.3d at 627. We agree with the district court that the facts here do not point "unequivocally" to the conclusion that Ireland had become

---

**⁹** At oral argument, Murphy's counsel argued that imposing an "unequivocal" standard is at odds with the Convention. This position was not advanced in the district court or in the briefs on appeal, and is thus deemed waived. *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

**¹⁰** *See Mozes*, 239 F.3d at 1079 (noting that the acclimatization inquiry is "so vague as to allow findings of habitual residence based on virtually any indication that the child has generally adjusted to life [in the new country]," and that "[e]ven if deliberate manipulation [of a child or a child's residence by a parent] were not a danger, divining from a child's observed contacts in a new country whether it has come to reside there habitually would be an enterprise fraught with difficulty. Children can be remarkably adaptable and form intense attachments even in short periods of time—yet this does not necessarily mean that the child expects or intends those relationships to be long-lived. It is quite possible to participate in all the activities of daily life while still retaining awareness that one has another life to go back to.")

E.S.'s habitual residence. Although E.S. developed strong ties to Ireland through school, extracurricular activities, and contacts with Murphy's family, she also maintained broad and deep "family, cultural, and developmental ties to the United States," spent Halloween, Thanksgiving, Easter and summers in the United States while living in Ireland, "maintain[ed] a relationship with Sloan's extended family," "maintain[ed] a community in Mill Valley" and "receive[d] her dental and medical care in California" while living overseas. The district court characterized her ties to the United States as "robust."

In light of these substantial ties to the United States and our traditional caution about inferring abandonment, E.S.'s time in Ireland, though significant, did not "unequivocally" establish that she had abandoned the United States as her habitual residence.[11] In short, we agree with the district court's finding that E.S.'s attachments to Ireland "did not shift the locus of [E.S.'s] development[,] and . . . any acclimatization did not overcome the absence of a shared settled intention by the parents to abandon the United States as a habitual residence."

**AFFIRMED.**

---

[11] Where, as here, a child retains strong ties to the parent in the former country, it "makes sense to regard the intentions of the parents as affecting the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude toward the contacts it is making." *Mozes*, 239 F.3d at 1079–80 (footnotes omitted).